The CHIEF JUSTICE
delivered the opinion of the court;
This-is an original suit in this court, in which the State of Texas, claiming certain bonds of the United States as her property, asks an injunction to restrain the defendants from receiving payment from the National government, and to compel the surrender of the bonds to the State.
It appears from the bill, answers, and proofs, that the United States, by act of September 9, 1850, offered to-the State of Texas, in compensation for her claims connected with the settlement of her boundary, $10,000,000 in five per cent, bonds, each for the sum of $1000; and that this offer was accepted by Texas. One-half of these bonds were retained for certain purposes in the National treasury, and the other half were delivered to the State. The bonds thus de *718 livered were dated January 1, 1851, and were,all'made payable to tbe State of Texas,'or bearer, and redeemable after the ‘31st day of December, 1864. They' were received in .behalf of the State by the comptroller of public accounts, binder authority of an) act of the legislature, which, besides giving that authority, provided that no bond should be available in the hands of ariy holder until after indorsement by .the governor of the State.
After the breaking out of .the rebellion, the insurgent legis- - lature of Texas, On the 11th of January, 1862, repealed the acf requiring the indorsement of the governor,* and on the same day provided for the.organization of a military board,' ■composed of the governor^ comptroller, and treasurer; and authorized a majority of that board to ’provide for'thé defence. of the State by means of any-bonds in the treasury, upon any acbo’untj to the .extent.of $1,000,OOO.† The defence confem-i' -plated by the act was to be-made agáinst the United States by war.' Under this authority the military, board entered into an agreement-with George W.VWhite and John Chiles, two of the defendants,, for’thé sale to them of orie hundred, ■ and thirty-five of these, bonds, then in the treasury of the Statej and seventy-six' more, then deposited with Dróege '& Co.,',in England; in payment for which they engaged to deliver to the board'd large quantity of cotton cards and medicine's.' This agreement was made on the 12th of January, ' 1865.’ ■ .On'the 12th of March, 1865, White and Chiles received from the military board one hundred and thirty-five of these bonds, none of which were indorsed by any governor of Texas. Afterward, in the course of the years 1865'and 1866, some of the same bonds came into .the possession of others of the defendants, by purchase, or as security for advances of money.
■ Such is a brief outline of the case. It will be necessary hereafter to refer more in detail to some particular circumstances, of it.
The first inquiries to which our attention was directed by' *719 counsel, arose upon the allegations of the answer of Chiles (1), that no sufficient autho.rity-is shown for the prosecution of the'suit in the name and on the- behalf of the State'of Texas; and (2) that the State', having severed her relations with a majority of the States of the. Union, a'nd having by her ordinance of secession attempted to throw off her alie-; giance to the Constitution .and government of the United States, has so far changed her status as to be disabled from prosecuting suits in the National courts'.
The firdt of these.allegations is disproved by the evidence. A letter of authority, the authenticity of which is not. disputed, has been produced, in which J. W. Throckmorton, electee! governor under the- constitution adopted. in ■ 1866, and proceeding under an act of the State legislature relating to these bonds, expressly ratifies and confirms the action of the solicitors who filed the billj.and empowers them to prosecute this suit; and it is further proved by the affidavit of Mr. Paschal, counsel for the complainant, that he was duly appointed by Andrew J. Hamilton, while provisional governor-of Texas, to represent the State of Texas in reference to the-bonds in controversy, and that his appointment has .been' renew- ed by E. M. Pease, the actual gpvernor.. If Texas was a State of the Union at the time.of these acts, and these per-, sous, or either of them, were competent to represent the. State, this proof leaves no doubt upon the question of authority.
The other allegation presents a question of jurisdiction. It is not to be-questioned that this court has original-jurisdiction of suits by Statea against citizens of other. States, or that the States entitled to invoke this jurisdiction must be States of the Union. But, it is equally clear that no such jurisdiction has been Conferred upon this courfc'of suits by.any other political communities than such'States.
If, therefore, it is true that the State of Texas was not at .ho time of filing this bill, or is not now, one of the United States, we have no jurisdiction of this suit,.and it is our duty to dismiss it.
*720 We are very seusible of the magnitude and' importance of this question, of the interest it excites, and of the difficulty, not to say impossibility,, of so disposing of it as to satisfy the conflicting judgments of men equally enlightened, equally 'upright, and equally patriotic. But we meet it iu the case, and we must determine it in the exercise of our best judgment,, under the guidance of the Constitution alone.
Some not unimportant aid, however, in ascertaining the true sense of the Constitution, maybe derived'from considering what is the correct idea of a State, apart-from any •union or confederation with other States. The poverty of language often compels the employment of terms ill quite different significations; and of this hardly any example move signal is to be found than in the use of the word- we 'are now considering. It would serve no useful purpose to attempt an enumeration of all the various sehses in which it is used. A few only need be noticed.
It describes sometimes a people or community of individuals united more or less closely in political relations,, inhabiting temporarily or-permanently the same country; often it denotes only the country or territorial region, inhabited by such a community; not unfrequently it is applied to the government under which the-people live; at other times- it represents the combined idea.of people, territory, and government.
It is not difficult to see that in all these senses the primary conception is that of a people or community. The people, in whatever territory dwelling, either temporarily or permanently, and whether organized under a regular government,’ or united by looser and less definite relations, constitute the state.
This, is undoubtedly the fundamental idea upon which the republican institutions of our own country are established. It was stated very clearly by an eminent judge,* in one of the earliest cases adjudicated by this court, and we are not aware of anything, in any subsequent decision, of a different tenor.
*721 In the Constitution the term state most frequently expresses the combined idea just noticed, of people, territory, and government. A state, in the ordinary sense of the Constitution's a political community of free citizens, occupying a territory of defined boundaries, and organized under a government sanctioned and limited by a written eonstitu-. tion, and established by the consent of the governed. , It is. the union of such states, under a common constitution, which forms the distinct and greater political unit, which that Constitution designates as the United States,-and makes of the people and states which compose it one people and one country.
The use of the word in this sense .hardly requires further remark. In the clauses which impose prohibitions upon die States in respect to the making of treaties, emitting of bills of credit, and laying duties of tonnage, and Which guarantee to the States representation in the House of Representatives and in the Senate, are found some instances of this use in the Constitution. .Others will occur to every mind.
But it is also used in its geographical sense, as in the clauses which require that a representative in Congress shall be an inhabitant of the State in which he shall be chosen, and that'the trial of crimes shall be held within the State where committed.’
And there are instances in which the principal sense of the word seems to be that primary one to which we have adverted, of a people or political community, as distinguished from, a government.
. In this latter sense the word seems to be used in the clause which provides that the United States shall ^guarantee to every State in the Union a republican-form of government, and shall protect each of them against invasion.
In this clause a. plain distinction is made between a State and the government of a State.
Having thus ascertained the senses in which the ymrd state is employed in the Constitution, we will proceed to consider the propef application of what has been said,
*722 Tbe Republic of Texas was admitted into the Union,'as a' State, on the 27th of December, 1845. By this act the new State, and the people of the new State, were invested with all the rights, and became subject to all tile responsibilities and duties ofthe original States under the Constitution.
From the date of admission, until 1861, the State was represented in the Congréss of the United States by her senators and representatives, and her relations as a member of the Union remained unimpaired. In that year, acting upon' the theory that the rights of a State under fe Constitution might be renounced, and her obligations thrown off at pleasure, Texas undertook to sever the bond thus formed, and to break up her constitutional relations with the United Stateá.
y On-the 1st of February,* a convention, called without authority, but subsequently sanctioned by the legislature regu- • larly elected, adopted an ordinance to dissolve the union between the State of Texas and the other States under the Constitution of the United States, whei’eby Texas was declared to be “a separate and sovereign State,” and-“her people and citizeris” to be “absolved frpm all allegiance to the United States, or the government thereof.”
It'was, ordered by a vote of the convention† and by an act of the legislature,‡ that this'ordinance should be submitted to'the people, for approval or disapproval, on the.23d of February, 1861.
. Without awaiting, however, the decision thus invoked, the convention, on the 4th of February, adopted ,a resolution designating seven delegates to' represent the State in the convention of seceding States at Montgomery, “inorder,” as the resolution declared, “that the wishes and inter-' ests of the people of Texas may be consulted in reference to the constitution and provisional .government that may- be established by. said convention.”
Before the passage of this resolution the convention had *723 appointed a committee of public safety, and adopted an ordinance giving authority'to that committee to take measures' for obtaining possession of the property of the United States in Texas, and for removing the National troops from' her limits. The members of the committee, and all Officers and agents appointed or employed by it, were sworn to secrecy , and to allegiance to the State.* Commissioners were at once appointed, with instructions to repair to the headquarters of General Twiggs, then representing the United States in com-, mand of the department, and to make the dehiauds necessary for the accomplishment of the purposes of the .committee. A military force was organized in support of these demands,, and an arrangement was effected with the,commanding general, by which the United States troops were engaged to leave the State, and the forts and all the public property, not necessary to the removal of the troops, were surrendered to the commissioners.†
These transactions took place between the 2d .and the 18th of Febz’uary, and it was under thesé circumstances that the vote upozz the ratification or rejectjon of the ordinance of secession was taken on the 23d of February. It was ratified'by a majority of the voters' of thé State.'
The convention, which had adjourned before the vote w^s taken, reassembled on the 2d of March,' and instructed the delegates already sent'to the Congz’ess of the seceding States, -.to apply for admission into the confederation, and do give the adhesion of Texas to its provisional constitution.
It proceeded, also, to make the changes in the State-constitution which this adhesion made necessary. The'wdrds “United Statés,'” Were stricken out wherever they occurred, and the'woz’ds “Confederate States” substituted; and the members of the legislature, and all- officers of the State, were required by the new,constitution to take an oath of fidelity to the constitution and laws of the new1, confederacy.
Before, indeed, theáe changes in the constitution had been *724 completed, the officer^ of the State had been required to appear before the committee and take an oath of allegiance to ,fhe Confederate States.
The governor and secretary of state, refusing to comply, were summarily ejected from office.
The members of the legislature, which had also adjourned and i-eassembled on the 18th of March, were more compli-.. ant. They took the oath, and proceeded on the 8th of April to provide by law for the- choice of electors of president and vice-president of the Confederate States.
The representatives of the State in the Congress of the - United States were withdrawn,'and as soon as the seceded States became organized under a constitution, Texas sent senators and representatives to "the Confederate Congress.
- In all respects, so far as the object'cou^d be accomplished by ordinances of the convention, by acts of the legislature, and by votes of the citizens, the relations- of Texas to the Union were broken up, and new relations to a new government'were established for them.
The position thus assumed could only be maintained by arms, and Texas accordingly took part, with the other Confederate-States, in the war of the rebellion, which these events.made inevitable. During the whole of that war there was no governor, or judge, or any other State officer in Texas, who recognized the National authority!. • Nor was any officer of the United States permitted to* exercise any authority whatever under the National government within the limits of the State, except under the immediate protection of the National military forces.
Did Texas, in consequence of these acts, cease to be a State? Or, if not, did the State cease to be a member of the Union?
It is needless to discuss, at length, the question whether the right of a State to withdraw from the Union for any cause, regarded by herself as sufficient, is consistent with the Constitution of the United States. •
The Union of the States never was a purely artificial and *725 arbitrary relation. It began among the Colonies, and grew out of common origin, mutual sympathies; kindred principles, similar interests, and geographical relations. It was confirmed and strengthened by the necessities of war, and received definite form, and character, and sanction from the Articles of Confederation. By these the Union was solemnly declared to “ be perpetual.” Arid when thesé Articles were found tó be inadequate to the exigencies of the country, the Constitution was ordained “to form a more perfect Uniom” It is difficult, to convey the idea of- indissoluble unity moré' clearly than by these words. What can be indissoluble if a perpetual Union, made more perfect, is not?
But the perpetuity and indissolubility of the'Union, by no means implies the loss of distinct and individual existence, or of the right of self-government by the States. Under the Articles of Confederation each State retained its sovereignty, freedom, and independence, and every power, jurisdiction, and right not expressly delegated to the United States. Under the Constitution, though the powers of the States were much restricted, still, all powers not delegated to the United States, nor prohibited to the States, are reserved to the .States respectively, or to the people. And we have al ready had occasion to remark at this terhi, that “ the people of each ¡átate compose a State, having its own'government, and endowed with all the functions essential to separate and independent existence,” and that “without the States .in uniou, there could be no such political bodpas the United States.”* Not only, therefore, can there be no loss of separate and independent autonomy to the States, through their union under the Constitution, but it may be not un-, reasonably said'that the preservation of the States, and the maintenance of their governments, are as much within the design and care of the Constitution as the preservation of the Union and the maintenance of the National government. The Constitution,’in all its provisions, looks to an indestructible Union, composed of indestructible States.
*726 When, therefore, Texas became one of the United States, she entered into an .indissoluble relation. All the obligation's of perpetual union, and all the guaranties of republican government in the Union, attached at once to the State. The act which consummated her admission into the Union was something more than a compact; it was the incorporation of a new member into the political body. And it was final, The union between Texas and the other States was as complete, as perpetual, and as indissoluble as the union between the original States. There was no place for reconsideration, or revocation, except through revolution, or through consent of the States.
Considered therefore as transactions under the Constitution, the ordinance of secession, adopted by the convention and ratified by a majority of. the citizens of Texas, and all the 'acts of her legislature intended to give effect to that ordinance, were absolutely null. They were utterly without operation in law. The obligations of the State, as a member of the Union, alnd of every citizen of the State, as a citizen of the United States, remained perfect and unimpaired. It certainly follows that the- State did not cease to be' a State, nor her citizens to be citizens of the Union. If this were otherwise, the State must’have become foreign, and her citizens foreigners. The war must have ceased to be a war for the suppression of rebellion, and must have become a war for conquest and subjugation.
Our conclusion therefore is, that Texas continued to be a State, and a State of the Union, notwithstanding the transactions to which we have referred. And this conclusion, in our judgment, is not in conflict with any act or declaration of any department of the National government, but entirely in accordance with the whole series of such acts and declarations since the first outbreak of the rebellion.
But in order to thevexercise, by a State, of the right to sue in this court, there needs to be a State government, compe- , tent to represent the State in its-relations with the National *727 government, so far at least as the institution'and prosecution of a suit is concerned.
And it is' by no means a logical conclusion, from the premises which we have endeavored to establish, that the governmental relations ,of Texas to tbe Union remained unaltered. Obligations often remain unimpaired, while relations are greatly changed. The .obligations of allegiance to the State, and of obedience'to her laws,'subject to the Constitution of the United States, are binding upon all citizens, whether faithful - of unfaithful to them; 'but the ./relations which subsist while these obligations are performed, are essentially different from those which arise when they are disregarded and set at nought. ' And the same must -necessarily be true of- the obligations and relations of'States and citizens to the Union. No one has been -bold enough to contend that, while Texas was controlled by a government hos-. tile to the United States, and in affiliation with,a hostile confederation, waging war upon the United States, senators chosen by her legislature, or representatives electéd by her-citizens, were entitled to seats in Congress; or that any suit, instituted in her name, could be entertained in this court.All admit that, during this condition of civil war, the tights^ of the State as a member, and of her people as citizens of the Union, were suspended. The government and the citizens -of the State, refusing to recognize their constitutional obligations, assumed the character of enemies, and incurred the consequences of rebellion.
These new relations imposed new duties upon the United-States. The first-was that of suppressing the rebellion. The next'was that of re-establishing the broken relations of the-State with the Union.; The first of these duties having been performed, the next necessai’ily engaged the attention of the 1 National government.
The authority for the performance of the first had been found in the power to suppress insurrection and carry on war; for the performance of the second, authority was derived from the obligation of the United States to guarantee to every State in the Union a, republican form of govern *728 ment. The flatter, indeed, in; the case of a rebellion which involves the government of a State, 'and for the time excludes the National authority from its limits, seems to be a necessary'' cornpletn'ent to the former.-
' ■ .Of this, the ease of Texas furnishes a striking'illustration. When the war closed there was no government hr the State, except that which had been oi'ganized for the purpose of waging war against the United States. That government immediately disappeared. The chief functionaries left the State. Many of the subordinate officials followed their example. ■ Legal responsibilities were annulled or greatly impaired.1 It Was inevitable that great confusion should prevail. If order was maintained, it was where the good sense 1 arid virtue of the citizens gave support to local acting magistrates, or supplied more directly the needful restraints.
A great social change increased the difficulty of the situation. Slaves, in the insurgent States, with certain local exceptions, had been declared free by the Proclamation of Emancipation; and whatever questions might be made as to the effect of that act, under the Constitution, it was clear, from the beginning, that its practical operation, in Conner*-tion with legislative acts of like tendency, must be complete enfranchisement. Wherever the National forces obtained control, the slaves became freemen. Support to the acts of Congress and the proclamation of the1 President, concerning slaves, was made a condition of amnesty* by President Lincoln, in December, 1863, and by President Johnson in Mayj 1865.† And emancipation was 'confirmed, rather than or- . dain-ed, in the insurgent States, by the amendment to thp Constitution1 prohibiting slavery -throughout the Union, which was proposed by Congress in February, 1865, and ratified, ; before the close of the following autumn, by the requisite three-fourths of the States.‡
. The new freemen necessarily became part of the people,, and the people still constituted the State; for States., like individuals, retain their identity, though changed to some' *729 extent in their constituent elements. And it was the State, thus constituted, which was n.ow entitled to the benefit ol > the constitutional guaranty.'
'There being .then no government in Texas -in constitutional rela-tions-with the Union, it became the duty of the ■ United States to provide for the restoration of such a government.' But the restoration of the government which existed before the rebellion, without a new election of officers, was obviously impossible; and before any such Election,could be properly held,'it was necessary that the old constitution should-reeeive such amendments as would conform its provisions to the new conditions created by emancipation, and afford adequate .security to the people of the. State.
In the exercise'of the power conferred by the guaranty . clause, as in the exercise of every other constitutional power, a discretion in the choice of means is necessarily allowed. It is essential only that the means must be necessary and proper, for carrying into execution the power conferred, through the restoration of the State to its constitutional relations, under-, a republican form of government' and that-no. acts be done, ■ and no authority exerted, which is either prohibited or mi-sanctioned by the Constitution.
It is not important to review, at length, the measures which have been taken, under this power, by the executive^ and legislative departments of the National government.1 It is proper, however, to observe that almost immediately after the cessation of organized hostilities, and while the war yet' smouldered in Texas, the President of the United States issued his proclamation appointing a provisional governor for the.State, and providing for the assembling of a convention, with a view to the re-establishment of a republican government, under an amended constitution, and to the restoration of the State to her proper constitutional relations.- A .'con- j vention was accordingly assembled, the constitution amended, elections held, and a State government, acknowledging its obligations to the Union, established.
Whether the action then taken was, in all. respects, warranted by the Constitution, it is not now.necessary to deter *730 mine.. The power exercised by the President was supposed, doubtless, to be derived from ,his .constitutional functions, as commander-in-chief; and, so long., as the war continued, it banpot be-denied that hie might institute temporary government within insurgent districts, occupied by the.National’ forces, or take measures, in any State, for the restoration of State government faithful to the Union, employing, however, in such efforts, only such means and agents as were authorized by constitution at laws.
But, the power to carry into effect the clause of guaranty is primarily a legislative power, and resides in Congress. “Under the fourth article of th¿ Constitution; it rests with Congress to decide what government is' the established one in a State. Nor, as the United States guarantee to each State a republican' government, Congress must necessarily decide Avhat government is established in the State, before it can determine whether it is republican or not.”
This is the language of the late Chief Justice, speaking for this court, in a case from Rhode Island,* arising from the , organization of opposing governments in tha.t State-. And, we think that the principle sanctioned by it may be applied, with even more propriety, to the, case of a State deprived of all rightful government, by- revolutionary violence;, though necessarily limited to cases where the rightful government is thus subverted, or in imminent danger of being overthro.wn by an opposing government, set up by force within the State.
The action of the President must, therefore, be considered as provisional, and, in that light, it seems to have been regarded by Congress. It was taken after the term of the 38th Congress had expired. The 39th Congress, which assembled in December, 1865, followed by the 40th Congress, which met in March, 1867, proceeded, after long deliberation, to adopt various measures for reorganization and restoration. These measures were embodied in proposed amendments to the Constitution, and in the acts knowu as the Reconstruct *731 tiou Acts, winch have bfeen so far carried .into effect, that a majority of the States which were engaged iii the ■ rebellion have been restored to their constitutional relations, under forms of government, adjudged to be republican by Coug'ress, through the admission of th'eii; “Senators and Representatives into the councils of the Union.”
Nothing .in the case before us requires the court to pronounce judgment upon the constitutionality of any particular provision of these acts. "
But, it is important to observe that these.acts themselves-show that the go ve rani tents, which had been established gud had been in actual operation under executive direction, were recoguized by Congress as provisional, as existing, and as capable’of continuance.
By the act of March 2,1867,* the first of the series, thesé "governments were, indeed, pronounced illegal and were subjected to military control, and were declared to be provisional only; and by the supplementary act of July 19, 1867, the third.of the series, it was further declared that it was the ti-u'e intent and meaning of the act of. March 2, that the governments then existing were not.legal State governments, and if continued’, were to be continued 'subject to the.military commanders of the respective districts and to the paramount authority of Congress. We do not inquire here into the constitutionality of this legislation so far as it relates to* military authority, or to the paramount authority of Congress. It suffices to say, that the terms of the acts necessarily imply recognition of actually existing governments; and' that in point of tact, the governments thus • recognized, in some important respects, still exist.
What has thus been said generally describes, with sufficient accuracy, the situation .of Texas. A provisional governor of the State was appointed by the President in 1865; in 1866 a governor was elected by the people under .the constitution of that year; at a.subsequent date a governor was appointed by the commander of the district. Each of the *732 three exercised executive functions and actually represented the State in the executive department.
Ia the case before us each has given his sanction to the prosecution of the suit, and we find no difficulty, without investigating the legal title of either to the executive office, in holding that the sanction thus given sufficiently warranted the action of the solicitor and counsel in behalf of the State. The necessary conclusion is that the suit was instituted and is prosecuted by competent authority.
The question of jurisdiction being.thus disposed of, we pro-heed to the consideration of the merits as presented by the pleadings and the evidence.
And the first question to be answered is, whether qr not ■the title of the State to .the bonds in conti oversy was divested by the contract of the military board with White and Chiles ?
That ihe'bonds were the.property of the State of Texas on the.11th of January, 1862, when the act prohibiting alienation without the indorsement of the governor, was repealed,' admits of no question, and is .not denied. ' They came-into her possession and ownership through public acts of the. general government and of the State, which' gave. notice to all th.e world of thé transaction consummated by them. And, we. think it clear that, if a State, by a public act of her legislature, imposes restrictions upon the alienation of her property, that- every person who takes a transfer óf su,ch , property must be held affected by notice of them. Alienation,.in disregard of such restrictions, can convey no title to the alienee.
In this case, however, it is said that the restriction imposed by the act of 1851 was repealed by the act of/1862-. And this is.true if the act of 1862 can be regarded as valid.' But, was it valid ?
The. legislature of Texas, at the time of the repeal, constituted one of'the departments > of a State .government, established in hostility to the Constitution of. the United States. It cannot be regarded, therefore, in the courts of • the United States, as a lawful legislaturé, or its acts as lawful' *733 acts. And', yet, it is an historical fact that the government of Texas, then in full control of the State, was its only actual government; and certainly if Texas had been a separate State, and not one of' the United States, the new government, having displaced the regular authority, and having established itself iin the Customary seats of power, and in the exercise of the ordinary functions of administration, would have constituted, in the strictest sense of the words, a de facto government, and its acts, during the period of its existence as such, would be effectual, and, in almost all respects, valid. And, to some extent, this-is true of the actual government of Texas, though unlawful and revolutionary, as to the United States.
It is not necessary to attempt any exact definitions, within which the acts of such a State government must be treated as valid, or invalid. It may be said, perhaps with sufficient accuracy, that acts necessary to peace and good order among citizens, such for example, as acts sanctioning and protecting .marriage and the domestic relations, governing the course of descents, regulating the co’nveyauee and transfer of property, real and personal, and providing .remedies for injuries to person and estate, and other similar acts, which would be valid if emanating from a lawful government, must be re.garded in general as valid when proceeding from, an actual, though unlawful government; 'and that acts in furtherance ' or support of rebellion against the United States, or intended to defeat the just rights of citizens, and other acts of like nature, must, in general, be regarded as invalid and void.
What, then, tried by these general tests, was the character' of the contract of the military board with White and Chiles?
That board, as we have seen, was organized, not' for the defence of the State against a foreign invasion, or for its protection against domestic violetice, within the meaning of these words as used in the National Constitution, but for the purpose, under the name of defence, of levying war against the United States. This purpose was, undoubtedly, unlaw- . ful, for the acts which it contemplated are, within the express definition of the Constitution, treasonable.
*734 It is true that the military board ivas subsequently reorganized.- Tt consisted, thereafter, of the governor and. two . other members, appointed and removable by him \ and was, therefore, entirely subordinate to executive control. Its general object remained: without change, but its powers were “extended to the control' of all public works ancj supplies, and to the aid of producing within the State, by the .importation of articles necessary and proper for such, aid.”
And it was insisted in argument ou behalf of some of the defendants, that the contract with White and Chiles, being, .for the purchase of cotton-cards and medicines, was not a contract in aid of the rebellion, but for obtaining goods capable of a use entirely.legitbmate and innocent, and, therefore,. that.^payment for those goods by the transfer of any property of the State was^iot unlawful. We cannof adopt this view. Without entering, at this time, upon 'the inquiry whether any contract made by such a board can be sustained, we are obliged to say that the enlarged powers of the board appear to us to have been coüfcrrexl in furtherance of its main purpose, of war.against the United States, and that the contract, under consideration, even if'made in the execution of those 'enlarged powers, was' still a contract in aid of the rebellion, and, therefore, void/ And we cannot shut our eyes to the evidence which proves that the act of repeal was intended to aid rebellion by facilitating the transfer of these bonds. It was supposed, doubtless, th,at negotiation of them would be less difficult if they bore upon their face no direct evidence of having come from' the possession of any insurgent State government. We can give no effect, therefore,' to this repealing act, '
It follows that the title of the State was noti divested by the act'of the insurgent government in entering into this contract.
. But it'was insisted further, in behalf of those defendants who claim certain of these bonds by purchase, ór as collateral security, that however unlawful may have been the means ■ by which White and Chiles obtained possession of the bonds, *735 they are innocent holders, without notice, and entitled to protection as such under the rules which apply to securities which pass by delivery. These rules were fully discussed in Murray v. Lardner.* We held ia that case that the purchaser of coupon bonds, beforé due, without notice' and ill good faith, is unaffected by want of title in the seller, and that the burden of proof in respect to notice and want of good faith, is.on the claimant of the bonds as against the purchaser. We are entirely satisfied with this doctrine.
Does the State, then, show affirmatively notice to these , defendants of want of title to the bonds in White and Chiles.?
It would, he difficult to give- a negative -answer to this question if there were no other proof than the legislative acts of Texas. But there is other evidence which might fairly be held to be sufficient proof of notice, if the rule to which we have-adverted could be properly applied to this cáse.
But these rules have never been applied to matured obligations. . Purchasers of notes or bonds past due take nothing but the actual right and title of the ven dors. †
The-bonds in question were dated January 1, 1851, and. were redeemable after the 31st of December, 1864. ' In strictness, it is true they were not payable on the day when they became redeemable; but the known usage of the United States .to pay all bonds as soon as the right of payment accrues, except where a distinction between redeemability and - payability is made by law, and shown on the face of the bonds, requires the-application of the rule respecting overdue obligations to bonds of the United States which -have become redeemable, and in respect to which no such dis-' tinction has been made.
Now, all the bonds in controversy had become redeemable before the date of the contract with White and Chiles; and all bonds of the same issue which have the indorsement oi *736 a govern'd’ of. Texas made before the date of the secession ordinance, — and-theré were no- others indorsed by -any governor, — had been paid in coin on presentation at the .treasury Department; while,-on the'contrary, applications for the payment of bonds, without the required indorsement, and of coupons detached from such bonds,-made to that department, had been denied.
As a necessary consequence, the negotiation of,these bonds necame difficult. They sold much below the rates fb'" would have commanded had the. title to them been q tioned, They wei;e' bought in fact, and under the c' stance's could only have been bought, upon speculation purchasers took the risk of a bad title, hoping, douh that through the action of the National government, „o the government of Texas, it might be converted into a gr „ one.
And it is trap that the first provisional governor of Texas eheburaged the expectation that these bonds would be ultimately paid to 'the holders. But he was not authorized to make any engagement in behalf of the State, and in fact made none. ■ It is true, also, that the Treasury Department, •influenced perhaps by tbesfe representations, departed . to. some extent ffom its original rule, and paid bonds held by some of the defendants" without the required indorsement., But it is-clear .that this change in the action of the department could not affect the- rights of Texas as a State of the Union, having.'a government acknowledging her obligations', to-.the National Constitution!
It is impossible, upon this evidence, to hold the defendants protected by absence of notice of the want of title in .'White and Chiles. As these persons acquired no right to paypient of these bonds as against the State', purchasers could acquire none through, them.
On the whole .case, therefore, our conclusion is that the State-of Texas is entitled to the relief sought by her bill, and a. decree must be made accordingly.*

 Acts of Texas, 1862, p. 45.

 Texas Laws, 55.

 Mr. Justice Paterson, in Penhallow v. Doane’s Admrs., 3 Dallas, 93.

 Paschal’s Digest Laws of Texas, 78.

 Id. 80.

 Laws of Texas, 1859-61, p. 11.

 Paschal’s Digest, 80.

 Texas Reports of the Committee (Library of Congress), 45.

 County of Lane v. The State of Oregon, supra, p 76.

 13 Stat. at Large, 737

 Ib. 758.

 Ib. 774-5.

 Luther v. Borden, 7 Howard, 42.

 14 Stat. at Large, 428.

 2 Wallace, 118.

 Brown v. Davies, 3 Term, 80; Goodman v. Simonds, 20 Howard, 366.

 See the decree, infra, p. 741.