Ashburn, J.
Being unable to agree with my brethren in the judgment pronounced in this action, I will give my reasons for such difference. The importance and novelty of the questions involved furnish a reason for the length of my opinion.
I will state only such facts as appear necessary to make manifest the questions in the case.
The action is founded upon a judgment rendered November 16, 1861, in the Circuit Court of Crawford county, State of Arkansas. Prior to the rendition' of this judgment, federal authority had made proclamation that the State of Arkansas was in rebellion against the constitutional authorities of the nation.
» The original proceedings in the action were in attachment, sued out in October, 1857. The plaintiff then resided in Arkansas, and the defendant in Ohio. In 1858, the defendant, as he avers in his amended answer herein, ■“ employed counsel, and appeared in the case,” to make his defense to the action. His attitude toward the action was, after that, never changed, so far as we can learn from the record. It shows vigilance on the part of his attorney, and that he continued to represent defendant’s rights, and his every interest in the action, ever after he was so employed, before and after the rebellion, throughout the legal proceedings. The action came to issue in August, 1859, upon the defendant interposing the plea of a general denial. Depositions of sundry witnesses were taken and filed in the case, prior to the rebellion, and received as evidence by the court on the trial of the case.
The action was submitted to the court, by counsel for the parties, without the intervention of a jury, and without request for delay or continuance, and judgment given in *633 favor of the plaintiffs. Defendant’s counsel, in his behalf, interposed a motion for a new trial on the merits of the cause. Motion for a new trial was heard and overruled-; defendant’s counsel excepted to the ruling of the court in overruling his motion for a new trial. A bill of exceptions, embodying the exceptions of defendant to the’ rulings of the court, and embodying all the evidence in the cause, was signed and sealed by the court, and made part of the record in the case. No exception was taken, for the reason of the now-alleged enforced absence of the defendant, nor as to the condition of the country.
In 1867 plaintiff commenced this action in the Superior Court of Cincinnati against defendant upon this Arkansas judgment. In the progress of the proceedings in that court defendant, Eoote, filed an amended answer, in which it is not even suggested that the general authority of the counsel in Arkansas was, in fact, at any time revoked; that he acted without authority, or in bad faith, except as affected by a condition of war between sections of the country.
The answer alleges, with much circumstance, that at the time of the trial the defendant, Eoote, was residing in the loyal states. It alleges the rebellion and war then existing, the army lines established, the President’s proclamation forbidding commercial intercourse, and that the people of Arkansas — including the judge of the court, the plaintiff, and the attorney of the defendants — became and were rebels and enemies of the United States, not acting under the government or authority of the United States, but under a usurped and illegal government, called the Confederate States, and that the judge of the court was not and never had been a judge of the State of Arkansas, as one of the United States; also, that communication was made impracticable, and that by these means he, Eoote, was prevented from attending the trial, but neither claiming nor suggesting that there was any occasion for his attendance, nor that he intended or desired to attend. His answer concludes that he was illegally and forcibly deprived of the *634 privileges and immunities of a citizen of the United -States' by the plaintiffs and the judge and officers of the court, and that the judgment therefore was fraudulent and void.
To this the plaintiffs filed a reply, averring the validity of -the Arkansas judgment.
Upon trial, in the Superior Court, the judgment of the court of the State of Arkansas was held to be “ ex parte and void.”
Was- this conclusion a sound conclusion of the law? With respectful deference for the judgment of that court, and also that of my brethren here, I think not.
As I understand the opinion of the Superior Court as set forth in its judgment, appearing in the record, it holds that the condition of civil war between the adhering and non-adhering states of the Union, and the relation of belligerents, was so destructive of the previous lawfully acquired jurisdiction of the state court of Arkansas over the person and subject-matter of the action, that its judgment and record are not prima fade evidence of anything, and can have no credit and can be of no effect whatever in the courts of Ohio. Thus holding that the act of Congress of May, 1790, in relation to'such judgment, has no force or efficacy whatever: that defendants could not lawfully defend in the court of Arkansas, and in fact and in law had no day in court.
This judgment may be impeached for cause by the rules settled in the law. But I hold it to be prima fade a valid judgment, entitled to that faith and credit guaranteed to judgments of a state court by section 1 of article 4 of the Constitution of the United States. The history of judicial decision on this question will not throw light upon the question now under consideration — Had the Arkansas court power to make the judgment made ?
It would be profitless to enter upon a general discussion of the effects of war, or the relations sustained by the belligerents during its continuance. I may say, however, that many of the common law incidents and consequencés of war — especially in relation to commerce, rights of property, *635 and the collection of debts — have been favorably modified by an enlightened and humanized civilization. By common usage or treaty regulations, modern wars are carried on and treaties made affecting as little as possible the laws,, usages, and institutions of the vanquished. In Clarke v. Morey, 10 John. 74, Judge Kent says: “ The opinion- that wars ought not to interfere with the security and collection, of debts, has been constantly gaining ground. And the progress of this opinion is worthy of notice, as it will teach us with what equity and liberality, and with what enlarged-views of national policy the question has been treated.” This eminent judge, after citing many cases illustrative of the enlightened, equitable, and just policy of this age, concludes by saying: “ In the treaty of commerce between the United States and Great Britain, in 1795, the government of each country was prohibited to interfere, by confiscation or sequestration, with private contracts, .and it was expressly declared to be unjust and impolitic that the debts, of individuals should be impaired by national differences.”
In considering the questions involved in this case, it must be borne in mind that our civil war was not a war between foreign nations. The parties to the conflict bore to each other, prior to the commencement of hostilities, during the rebellion and afterward, such a relation that ordinances of secession — formal legislative declarations of separation— four years of armed conflict scarred with a hundred battles, did not break the bond of union that bound state to state, and each to the constitution. All attempts at secession, whether by ordinance or legislative enactment, were abortive. The ordinances and legislative enactments have, been pronounced nullities — void ab initio. 7 Wall. 700; 6-"Wall. 443.
By the armed resistance of the states in rebellion, the relations of the non-adhering, states to the national government were disturbed, and by reason of such obstruction the functions of the federal government were for a time suspended in the insurrectionary states. When the rebellion *636 was crushed out, questions denominated reconstruction ” .arose, but none of reádmission into the Union.
During the rebellion, influences from without and necessities within induced the federal government to adopt certain principles incident to a condition of war between foreign nations — as the blockade, exchange of prisoners, etc. So that during the civil war, to the world the condition of the contending sections was that of belligerents; while their relation to each other was that of members of the same family, some of which had rebelled against the ■others and the authority of the whole. When the rebellion was at an end, no treaty of peace or of conquest was entered into by and as between belligerents. The nominal •confederacy, founded in treason, vanished in the presence ■of a restored federal constitution, as the fog upon the river in the morning sun. The men of the rebellion were told to go home in peace. They did so, and the insurrectionary states resumed their relations to the national government under the constitution.
During the entire period of the rebellion, the non-adhering states were states de jure in the Union. All their efforts in favor of secession did not, in the expressive language of the Chief-Justice, cause them to lose their “independent autonomy.” In Shortridge v. Mason, he says, “these acts (efforts at secession) did not effect, even for one moment, the separation of the states from the Union, any more than the acts of an individual who committed grave offenses against the state, by resisting its officers and defying its authority, can separate himself from the state. Such acts may subject the offender to an outlawry, but can relieve him from no responsibility, nor discharge him from no duty.” This doctrine is recited with approval in Latham v. Clark, 25 Ark. 578-9.
It is a question worthy of consideration : What was the ■condition of the state government of Arkansas after she had adopted an ordinance of secession, and war was inaugurated? She had a statp government. Was it a de jure ■or a de facto state government ? If the hítate maintained a *637 de jure government during the rebellion, the proceedings of her courts, not in aid of the rebellion, nor subversive of the constitutional rights of a citizen, proceeded from and under the authority of a lawful government, and are valid. On the other hand, if her state government was a defacto government, still the proceedings of her courts, not in aid of the rebellion, nor hostile to the rights of the citizen under the constitution of the United States, are valid from necessity in the interests of civil society and social order. 20 "Wall. 459. In either case, this judgment of the state court of Arkansas is a valid judgment, and prima facie should receive faith and credit as such in Ohio courts under the constitution and laws of the United States, unless invalidated by some external force.
Upon principles, now too well understood to be seriously controverted, the State of Arkansas, from the day of her admission into the Union until this day, has continued in such legal relation. Texas v. White et al. 7 Wall. 700. Ohio, and other States, after admission into the Union, changed, altered and amended their organic laws without consulting the wishes or asking consent of Federal authority. Whether such renewed organic laws were in harmony with the Federal Constitution and laws could only be determined when questions arising under them were adjudicated by the Federal courts.
The people of Arkansas, before and after the rebellion, might rightfully change her constitution, and such parts ot the altered organic law as remained in harmony with the Federal constitution and subserved the proper purposes of domestic state government, and in no way operative in aid of the rebellion, were valid constitutional • pi-ovisions and legal elements of state government — among which, in this case, was the provision for a judical department, with powers and duties, such as are found in most state constitutions.
Arkansas, then, at no time derived her power to adjudicate from the confederate nor the Federal government. The authority of her courts to hear and determine matters *638 'in judicial form was derived from her own state constitution. Her people alone, speaking through her organic law, conferred the power on her’ courts to adjudicate.
If, however, the acknowledged legal existence of the ■State of Arkansas during the rebellion by the Federal ¡authorities is necessary to prove her state existence,.there is abundant evidence that the existence of the state gov■ernment of Arkansas was fully acknowledged during the rebellion by both the executive and legislative authority of the United States. Proof of executive recognition is found 'in the President’s proclamation of September 22, 1862, in which he expressly says to the States then' in rebellion, that the war has been, and will still continue to be prosecuted, to restore the relations between the United States and each of the states and the people thereof in which the relation is or may be suspended or disturbed.” Also in his-•proclamation of May 19, 1862, concerning compensation to the states for the gradual abolishment of slavery, &e. The •legislative evidence is found in the action of Congress, .approved March 4, 1862, apportioning to all the States in rebellion, each their full ratio of representation in Congress.
When this judgment was rendered, Arkansas was a • state de jure, having a judicial department in the full exer■cise of its. judicial functions, and having in a lawful way obtained jurisdiction over the person of the defendant and •the subject-matter of the suit, which subject-matter in no way tended to aid or give comfort to the rebellion. Such judgments should be held valid, and the court upheld in the interests of society. Prima facie, faith and credit should -be given to such judgments of such courts.
Suppose I am mistaken in regard to the legal status of •the state government' after the attempted secession,- and the state government was not de jure, then I hold that the government of the state was a state government de facto, .and, as such, the judicial proceedings of her courts are valid, •and entitled, under the constitution, to receive, prima facie, faith and credit. And I do this upon the authority of -United States v. Insurance Companies, 22 Wall. 99. In *639 tliat case the validity of certain acts of the legislature of Georgia, made during the rebellion, were brought in «question. The court, in its opinion delivered by Justice •Strong, says, “No doubt the legislature of Georgia in 1861 .and 1863, when the enactments were made for the incorporation of these plaintiffs, was not the legitimate legislature of the state. The state had thrown off its connection with the United States, and the members of the legislature had repudiated, or had not taken the oath by which the third section of the sixth article of the Constitution requires the members of the several state legislatures to be bound. But it does not follow from this that it was not a legislature, the acts of which were of force when they were made and are ,in force now. If not a legislature of the state de jure, it was at least a legislature de jacto. It was the only law-making body which had any existence. Its metEibers acted under color of office, by an election, though not qualified according to the requirements of the Constitution of the United States. Now, while it must be held that all their acts in hostility to the Constitution, or to the Union of which the state was an inseparable member, have no validity, no good reason can be assigned why all their other enactments, not forbidden by the Constitution, should not have the force which the law generally accords to the action of de facto public officers.”
The above doctrine was laid down when the Supreme Court of the United States was considering this question, Should the United States Courts “ recognize the competency of these bodies known as the legislatures of the insurgent states, to create corporations, such as insurance, banking and trust companies,” “ With legal capacity, .after the close of the war, to enforce rights growing out of such legislation in the federal courts ? ” The answer was in the affirmative, and in the language, quoted from the decision.
This language, and the principle • involved, are equally potential when applied to the judicial department of the «State of Arkansas. When so applied it will read: No *640 doubt tbe Circuit Court of Arkansas, in 1861, when the judgment was rendered in favor of plaintiff, was not the legitimate Circuit Court of the state for Crawford county. The state had thrown off its connection with the United States, and the judges of that court had repudiated or had not taken the oath by which the third sectibn of the sixth article of the constitution requires the judges to be bound.But it does not follow, from this,that it was not a court the proceedings of which were of force when they were had, and the judgments there rendered in force now. If not a court of the state de jure, it was at least a court de facto. It was the only adjudicating tribunal that had any existence there. The judges acted under color of office by virtue of election, appointment, or selection, though not qualified according to the requirements of the constitution of the United States. Now, while it must be held that all their acts, proceedings, and judgments in hostility to the constitution of the national government or Union, of which the State of Arkansas, was an inseparable member, have no validity, no good reason can be assigned why all its other proceedings, including judgments not forbidden by the constitution should not have the force which the law generally accords to the action of de facto public officers, de facto judges, de facto courts.
What force and effect will be given to the acts and proceedings of de facto public officers is well stated by Kent in his Commentaries, vol. 2, page 295: “ In the case of public officers who are such de facto, acting under the color of office by an election or appointment -not striclty legal, or without having qualified themselves by the requisite tests or by holding over after the time prescribed for the new appointment, as in the case of sheriffs, constables, etc., their acts are held valid as it respects the right of third persons who have an interest in them, and as concerns the public, in order to prevent the failure of justice.” In Hildreth’s heirs v. McIntire’s devisee, 1 J. J. Marshall, 206, the court, by Robertson, J., said: “ Where government is entirely revolutionized, and all its departments usui'ped by force, or *641 by tbe voice of a majority, then prudence recommends, and necessity enforces obedience to the authority of those who-may act as pqblic functionaries, and in such a case the acts-of a de facto executive, a de facto judiciary, and a de facto• legislature, must be recognized as valid.”' See 19 Ohio, 222.
In Horn v. Lockhart, 17 Wall. 580, it was held with great-distinctness. “We admit,” says the court, “ that the acts of the several states (in insurrection) in their individual capacities and of their different departments of government, executive, judicial, and legislative, during the war, so far as they did not impair or tend to impair the supremacy of the-national authority or the just rights of citizens under the constitution, are, in general, to be treated as valid and binding. The existence of a state of insurrection and war did not loosen the bonds of society, or do away with civil government, or the regular administration of the laws. . . No one that we are aware of seriously questions the validity of judicial or legislative acts in the insurrectionary states, touching these and kindred subjects, when they were not hostile in their purpose or mode of enforcement to the authority of the national government, and did not-impair the rights of citizens under the constitution.” See also Texas v. White and Chiles, 7 Wall. 700; Sprott v. The United States, 20 Wall. 457.
Now, “ after these emphatic utterances, all controversy should cease ” as to the legality of the acts and proceedings of-the respective departments of the non-adhering-states not in aid of the rebellion or an infringement of the-rights of the citizens under the constitution. All the proceedings and judgments of the courts in the insurrectionary states during the war, which vere not hostile to the Union, or to the authority of the general government, and were not in conflict with the constitution of the United States or of the states, have the same force and validity as if they had been the judgments of the legitimate courts.
Germane to this doctrine was the holding of the court in White v. Cannon, 6 Wall. 443. This was an action to re *642 •cover the possession of land. The State of Louisiana passed her ordinance of secession on the 26th day of January, 1861; five days afterward, January 31, 1861, the judgment was rendered. The court say, in disposing of tihe •case: “ The objection that the judgment of the Supreme ■Court of Louisiana is to be treated as void because rendered isome days after the passage of the ordinance of secession ■of that state is not tenable. That ordinance was an absolute nullity, and of itself alone neither affected the juris■dietion of that court, nor its relation to the appellate power •of this court.”
Tested by the principles laid down in United States v. Insurance Companies, the judgment in this case was and is valid. The subject-matter of the suit had no relation to .anything but a civil action, commenced in time of peace, for the recovery of money due from one person to another. Nothing in the proceedings of judgment indicate any purpose or operation hostile to the Union, in conflict with the Union, or in conflict with any rights of the citizens under ¡the constitution. It was an ordinary proceeding to obtain ;a judgment, such as might have been,, had there been no war, or an attempted secession; such as is of daily occurrence in all the states of the Union before and since the rebellion.
The Circuit Court of Arkansas had, at the time the action was commenced, jurisdiction over the subject-matter •of the action; and, afterward, by the voluntary action of defendant, acquired jurisdiction over his person. “A court will acquire jurisdiction of a person in a suit originally commenced by an attachment in rem, if the party .against whom the claim is set up voluntarily appears and submits himself to the jurisdiction, demurs, pleads, and goes to trial on the issue made.” 22 Wall. 77.
In this case, as shown by the record, the defendant, after attachment,- appeared, answered by pleading the general issue, and employed counsel in the court to represent him, and prepare the case for trial. The author *643 ity of that attorney up to and during the proceedings, at the trial,and after, remained unrevoked and in full force.
A citizen of one of the adhering states, having property or rights in a non-adhering state, could lawfully appoint an agent or attorney in the locality of his property or rights, whose acts, within the scope of his authority, would bind his principal. Such is the doctrine held in Buchanan v. Carry, 19 Johns. 137. "Were there no authority on the subject, such a right and power would accord with reason and our civilization. But we are not without authority upon the question. In Robinson v. International Life Association Society of London, 42 N. Y. 54, Hunt, J., says : “A power of attorney to collect a debt, or to receive money, seems to continue valid although the principal resides in an enemies’ country.” In Moneax v. Urquhart, 19 La. Ann. 485, it was held, “An agent or mandatory entrusted with the manage, rqent and control of real estate here (in Louisiana), for his principal, who resided in one of the northern states, before and during the war, was not absolved from his, obligation to his principal by the breaking out of hostilities between the two sections of the country ; the agency continued during the war, and his acts, as such, are binding upon his principal.” To the same effect, are King v. Hanson, 4 Cal. 259; Conn v. Penn et al., 1 Pet. C. C. 496; Ward v. Smith, 7 Wall. 447-452.
It is said war forbids all communication between enemies, closes courts of the alien enemy. It does cut off all commercial relations, and ordinarily will close the courts against an enemy. But, I take it, not in this case, because the constitution of Arkansas, adopted March 4, 1861, provided:
“ That no inconvenience may arise from this change of government, we declare that all writs, actions, prosecutions, judgments, claims, and contracts of individuals and bodies corporate, shall continue as if no change had taken place in the constitution or government of this state; and all process which may have been issued under the authority of this state, previous to this time, shall be as valid as if *644 issued after the adoption of this constitution.” — Schedule7 Sec. 1.
"When, as in this case, the énemies’ court, in time- of peace, acquired jurisdiction over the subject-matter' of the-action and the persons of the parties, and the action involves the mere question of personal indebtedness, in no way affecting the question of belligerency, and the court, invoked by the parties litigant, or their agent, proceeds to adjudicate, the judgment rendered will be valid. The party who, in-person or by his attorney, invoked the action of the court, making no objection to jurisdiction or authority of the court, will be estopped, ever afterward, from denying the authority of the court and the validity of its judgment.
It is claimed that, by reason of the war, the defendant •could not be present at the trial, and, hence, has beén deprived of a constitutional right. Is this the case ? In civil cases, the constitution makes no such provision in his favor. Once the court has acquired jurisdiction as to his person, and over the subject-matter, judicial proceeding will not be arrested by reason of the non-attendance of a party to the action. .When a party to a suit is represented by counsel, an action will not be delayed by reason of such absence, unless it is made to appear that his presence is necessary to a proper adjudication of the case. To be present at his trial, in a civil action, is a party’s privilege and common law right, but not guaranteed by the constitution. I take it, that the personal presence of the defendant, at and during the trial, was not a fact of such legal significance, that his absence, whether voluntary or enforced, would disturb the authority of the court, and this, more especially, when he had, at the court, an accredited attorney, with full power to represent his interests and protect his rights — which duties the attorney performed in an ample manner, and, so far as advised by the record, with entire freedom. And, I think, state rebellion did not revoke the authority of this agent.
A question arises, Are judgments of state courts, ren *645 .dered during the rebellion, in civil actions, not in aid of or promotive of the rebellion, valid ?
In Hawkins v. Filkins, 24 Ark. 286, decided in 1866, the validity of a judgment rendered in Arkansas, during the rebellion, was directly called in question. It was claimed that the state court which rendered the judgment, in the time of the civil war, had no legal existence, and hence its •judgment was void. After full consideration, the Supreme Court of Arkansas held the judgment valid; and held, further, that the state courts, during rebellion, were courts de jure. The judgment grew out of litigation between two citizens of Arkansas, and is of significance here, in showing that a judgment of a state court in Arkansas, rendered during the existence of the war, is held there to be valid. Unless there is something to take this judgment out of the force of that holding, this judgment should have the same force in Ohio as in Arkansas — no more, no less.
It is claimed, by defendant, that Hawkins v. Filkins, was overruled by Latham v. Clarke, 25 Ark. 574. I think not. The action in the case of Latham v. Clarke was founded upon a promissoxy note, payable, by its terms, in “ confederate money, oxx demand.” ’Wilshire, J., who delivered the opinion of the coui't, says : “ This case presents for our -consideration axxd determinatioxx the single questioxx of the liability of a contract for the payment of confederate money.” The court holds that, “ Coxxtracts for the payment of confederate money, made between individuals in the ordinary coux’se of their private transactions, within the rebellious districts, while subject to the power of the Rebellious authoiities, are illegal and void.”
The decision of the court is put on this ground: “ It (the confederacy) was without money, without national ■recognition, and without credit; and for the pui’pose of supporting itself, and to carry on the war it had levied -against the United States, it x’esorted to the issue of the notes of its treasurer, commonly called confederate money. To sustain that issue, and to make it the sinew of wai*, it '.-called and relied upon its people to support and sustain *646 these notes of its treasurer, and to give them currency and consideration as money.”
The ruling in Latham v. Clarke, is based upon the reason, as the principle of the decision, that the issue and circulation of those confederate treasury notes as money, was in aid and furtherance of the war of rebellion, and that contracts which stipulated for payment in “ confederate money ”' because one of the “sinews” of the war, were illegal and void. The case does not reach the question this court has in course of decision, and in no legal sense overrules the-case of Hawkins v. Filkins. The questions for determination in the respective cases are unlike. The one was to settle the validity of a judgment of a state court; the other the legality of contracts, by terms, payable in confederate-money.
I have endeavored to make it clear that the ordinances-of secession were utterly void; that all action of state legislatures of the insurrectionary states had, to carry the-states out of the Union, was void; that the alleged confederacy was a temporary affair, and wholly illegal; that states of the Union once organized may change, alter, and amend their organic law at pleasure ; that the bond of national union among the states is indestructible; that the-states in insui’rection at no time during the rebellion lost-their ’existence as states; that the constitutional ligament that sealed them to the Union was never broken ; that the acts and proceedings of the several departments of the state-governments, whilst in rebellion, but not in aid of rebellion,, or calculated to aid in sustaining the confederacy in war,, nor in conflict with the constitutional fights of the citizen,, were valid acts and proceedings; that domestic judgments-—-judgments where the state court had jurisdiction of the-person and subject-matter in suit, and in no way in aid of the rebellion-, were and are valid judgments. These principles, like threads of iron, underlie this whole case and all its parts, and in my judgment determine the validity of this judgment.
The Constitution of the United States, article 6, sec. 1„ *647 declares that “ full faith and credit shall be given in. each-state to the public' acts, records, and judicial proceedings of every other state. And the Congress may, by general laws, prescribe the manner in which such acts, records, and proceedings shall be proved, and the effect thereof.” As early as May 26,1790, Congress, by law, provided: “The records and judicial proceedings of the courts of any state shall be proved or admitted in any other court within the United States, by the attestation of the clerk, and the seal of the court' annexed, if there be a seal, together with a certificate of the judge, chief justice, or presiding magistrate, that the attestation is in due form. And the said records and judicial proceedings, so authenticated, shall have such faith and credit given to them in every court within the United States, as they have by law or usage in the courts of the State from which they are taken.” US. Statute at Large, sec. 905.
The record in this case appears valid on its face. It is attested in due form, and certified as directed in the statute.
“ To make a record of a judgment valid upon its face, it is only necessary for it to appear that the court had jurisdiction of the subject-matter of the action and of the parties, and that a judgment in fact had been rendered.”" 22 Wall. 79.
All these conditions appear in this record. And no fact appears in the record to show that, in law or fact, the state court of Arkansas ever lost jurisdiction of the action.
"What would have been the effect of belligerency between the sections of the United States upon a judgment in the state courts of Arkansas, rendered under other conditions than this one, is not now for consideration. I am treating of this case upon the facts disclosed in its record. I hold that a citizen of a loyal state may rightfully have an attorney in an insurrectionary state during the progress of a rebellion, to defend "his legal rights in court and out, and to take care of his property in the insurrectionary state; that he may invoke the action of the courts in such rebellious *648 state in a proper case, and if the court acts, takes jurisdication, nd adjudicates, the proceedings and judgment of such court, for or against him, will be valid, and are, prima facie, entitléd to such faith and credit as is provided in the constitution of the United States.
The constitution of the United States is the heart of the nation; the Union the artery through which the national laws are carried into every department of the state government where it is proper for them to be carried. This artery was bruised in the civil war, but not severed. By reason of insurrectionary obstructions, it failed to carry the national authority during the rebellion into the non-adhering states. So soon, however, as the war was ended, and its obstructions removed, the insurrectionary states settled into their constitutional relations to the national government and toward each other. This relation once restored, the federal constitution and laws re-entered these states with all the authority and force they had prior to the war, and embraced whatever had been lawfully done by the ■courts and other departments of state government, and whatever was then valid by law or necessity. The act of May 26, 1790, on the restoration of peace, if my conclusions are sound," found this judgment in favor of plaintiff ■dormant, but valid in the State of Arkansas, and, by authority of the constitution .of the United-States, imparted to it such vigor as to authorize the plaintiff to legally claim for it in the state courts of Ohio prima facie faith and credit. I therefore hold that the judgment was not ex parte, and is not, by reason of the rebellion, void.