## LATHAM *v.* CLARK.

CONFEDERATE MONEY—*contracts based upon, even between individuals, void.* Contracts for the payment of *Confederate money* made between individuals in the ordinary course of their private transactions, within the rebellious districts, while subject to the power of the rebellious authorities, are *illegal* and *void.*

This *currency* was upon its face made payable after the ratification of a *treaty of peace* with the United States; and individuals making contracts based upon it must be *held* to have done so with a knowledge of the illegality of its issue.

THE REBELLION—*nature of it.* The *war* levied by the so-called Confederate States was *treason.*

All citizens of the United States who *participated* in the rebellious government, or *voluntarily* entered the armies or navies of the rebellion, or *aided* or *encouraged* the rebellion in the most minute degree, were *traitors.*

The Confederacy was *not* a government " *de facto,*" notwithstanding the concession by the political department of belligerent rights.

This *pretended* government could not, as a government of paramount force, render valid contracts between individuals, based upon, or for the payment of, Confederate money.

Notwithstanding the ordinances of secession, the rebellious States continued during the rebellion a part of the Federal Union, and the people thereof continued to *owe* allegiance to the Government of the United States.

POLITICAL DEPARTMENT—*prerogatives of.* It is the *exclusive* province of the political department to determine what rights shall be accorded the belligerents, in case of civil war, and to what extent the acts of the rebellious government, including the issuing of its notes to circulate as currency, should be recognized.

### Appeal from Sebastian Circuit Court.

Hon. E. J. SEARLE, Circuit Judge.

KING & DUVALL and CLARK, WILLIAMS & MARTIN, for appellant.

WATKINS & ROSE, for appellee.

WILSHIRE, J.

At the April term, 1867, of the Sebastian circuit court, John B. Latham brought suit, by assumpsit, against Sarah Clark, on a promissory note, bearing date March 1, 1863, payable in " Confederate money," on demand.

The defendant demurred, in short, on the record. The court sustained the demurrer, and rendered judgment against the plaintiff for costs ; and the plaintiff appealed to this court.

This case presents, for our consideration and determination, the single question of the legality of a contract for the payment of " Confederate money."

To arrive at a correct determination of the question presented, it becomes necessary to inquire into the origin and character of " Confederate money," and the authority for its issue.

It is history, too familiar to be questioned now, that, early in the year 1861, the States of Virginia, North Carolina, South Carolina, Georgia, Alabama, Mississippi, Louisiana, Texas and Arkansas, by the action of their citizens, combined for the overthrow of the Government of the United States, within their boundaries, and for the establishment of a government for themselves, separate from, independent of, and hostile to the national Government.

For the purpose of forming this combination, these several States, in most instances, by conventions of their people, and in some by acts of their Legislatures, passed what they called ordinances of secession, attempting thereby to sever their relations with the Government of the United States, to withdraw from the Federal Union, to release their people from their subjection to the laws of the land, and their allegiance to the nation.

Having performed these ceremonies, these States entered into

a combination among themselves, with the avowed intention and purpose of setting up and establishing a separate and independent government, distinct from and hostile to the Government of the United States. To carry out this glittering scheme, a constitution of government, for the States thus combining and confederating, was framed, and adopted by them, a President and other necessary officers were chosen or appointed, to fill the offices and discharge the duties of the various departments of their central government.

These States, having thus assumed to themselves the right and power to recall powers delegated by them respectively to the United States, and to withdraw from the Federal Union; to discharge their citizens from their allegiance to the national Government, and subjection to its Constitution and laws, and establish for themselves a government independent of and hostile to that of the United States, claiming for it all the rights, powers, and jurisdiction, belonging to an independent and sovereign State or nation; this central government, thus formed, or attempted to be formed, assumed the national appellation of the " Confederate States of America." It assumed to appoint commissioners, and sent them to foreign countries to announce the birth of a new nation, and to ask for it a recognition as one of the nations of the earth.

Simultaneous with the passage by these States of their several ordinances or acts of secession, so-called, and the organization by them of this pretended central government, there was raised by it, or the States composing it, and organized and equipped, large armies of troops, and other warlike acts done to put this central government on a war footing, for the purpose of establishing and maintaining itself, and to resist the national Government in its attempt to enforce the laws and exercise the authority of the United States within the limits of these rebellious States. The forts, arsenals, dock-yards, custom houses, moneys, and other public property of the United States, within the States attempting to secede, were seized by the rebellious authorities, and used by them to aid in the

establishment of their pretended central government, and for the purpose of levying and carrying on war against the United States.

The Constitution and laws of the national Government were disregarded and wholly ignored within these rebellious States, and the officers and persons acting under Federal authority, within the assumed jurisdiction of this pretended central government, were expelled or required to renounce their allegiance to the Government of the United States, and to swear allegiance to the pretended and rebellious Government of the Confederate States.

To support and maintain this government of force and violence, and to aid it in its avowed purpose to overthrow the national Government; to establish and maintain its national existence and independence; to augment, maintain and furnish it with all the necessary supplies and munitions of war for the support of its armies and navies, and to supply itself with money, the "sinew of war," it arrogated to itself the usual rights and powers of a sovereign State or nation, and issued the notes of its Treasurer, known as Confederate money, redeemable and payable by this self-styled government at a specified time after a ratification of a treaty of peace between that pretended government and the United States.

These notes were issued and put into circulation by the Confederate Government, to become a circulating medium among the people of these States; and the people were called upon to support it, and give it currency and circulation, by that Government, by its pledge of the faith and credit of the Confederate States for the payment of these notes, as stipulated on their face.

With this issue of the Treasurer of the "Confederate Government," it purchased and paid for such supplies and munitions of war, and paid for such services as the demands of the rebellion required.

This, we understand to be, briefly, the history of the origin, and the authority for the issue of "Confederate money."

37

We are now called upon to determine whether a contract for the payment of "Confederate money," made between individuals in the ordinary course of their private transactions, within the rebellious districts, while under the control and subject to the power of the rebellious authorities, is valid and legal, and can be enforced.

We think it must be admitted by all, however attached some may have been to the cause of the rebellion, that "Confederate money" must now be treated by the court as having been issued not only without authority of law, but for an unlawful and treasonable purpose; and that the issue and use made of it by the "Confederate authorities" must be treated as illegal and void, and as being opposed to public policy. Taking this to be conceded, as we do, in discussing the question, presented by the case under consideration, we shall have to inquire into the use made of "Confederate money," by the people of the rebellious district, in connection with the history of the Confederate Government, to assign the reasons for arriving at the conclusion we do.

It must be borne in mind that the States composing the Confederate States Government, were a part of those constituting the Federal Union, the citizens of which were also citizens of the United States, owing allegiance to its Constitution, and obedience to its laws; and that neither their acts or ordinances of secession, so called, nor the organization by them of their rebellious central government, deprived the national Government of its lawful dominion over them, or the right to enforce obedience to its Constitution and laws; nor did they discharge their citizens from their allegiance to the Government of the United States; but these States remained a part of the Federal Union, and their citizens continued to owe an allegiance to the Constitution and Government of the United States, and to be subject to its laws.

We understand this doctrine to be distinctly announced by Chief Justice CHASE, in the case of *Shortridge v. Mason.* There the learned judge said, "these acts did not effect, even for a

moment, the separation of the States from the Union, any more than the acts of an individual who committed grave offenses against the State, by resisting its officers and defying its authority, can separate himself from the State. Such acts may subject the offender even to outlawry, but can relieve him from no responsibility, nor discharge him from any duty."

This doctrine, we think, can not be controverted. It follows, then, that the war levied by these Confederate States against the United States was treason; and all persons, citizens of the United States, who participated in the organization of this rebellious and treasonable Government of the Confederate States, or voluntarily engaged in the armies or navies of the rebellion, and all who aided, abetted, or encouraged the rebellion, were traitors, and guilty of treason against the United States.

In the case of the *United States v. Ballman and Swartwout*, 4 *Cranch*, 75, where the defendants were charged with the crime of treason against the United States, by being connected with the conspiracy familiarly known as the "Burr conspiracy," it was held that all persons who were leagued with the conspirators, however minute or remote, were equally guilty. In that case, Chief Justice MARSHALL said: "It is not the intention of the court to say that no individual can be guilty of this crime (treason) who has not appeared in arms against his country. On the contrary, if war be actually levied, if a body of men be actually assembled for the purpose of effecting by force a treasonable purpose, all of those who perform any part, however minute or remote from the scene of action, and who are actually leagued in the general conspiracy, are to be considered as traitors. But there must be an actual assembling of men for a treasonable purpose to constitute a levying of war."

The learned judge, in that case, further said: "In the case now before the court, a design to overthrow the Government of the United States in New Orleans by force, would have been unquestionably a design which, if carried into execution, would have been treason."

It is a fact, established and passed into authentic history, that the combined conspiracy of the people of these rebellious States culminated in the organization, by them, of the pretended central Government of the Confederate States, and in supplying it with large bodies of troops, with which to establish itself and to resist and overturn the national Government within its limits. Its armies were numbered by thousands, they were organized with all the officers of command usually required for a well organized military force, and were actually engaged in open hostility to, and war against, the United States.

This rebellious government did not confine its operations and designs to the modest limits of the overthrow of the Government of the nation, within a single city, but its ambitious pretensions extended, at least, to the overthrow of the power and authority of the Government of the United States within the States composing it. Its armies were large and imposing; they were armed and equipped with all the implements of war; and, as we have said, were actually employed in open hostility to and war against the United States; and all persons voluntarily engaged in them, and all who aided them, or the Confederate Government, however minute or remote, were traitors to their country, and guilty of treason.

This pretended central government was without recognition as a government, of any kind, either by the Government of the United States or by any foreign power. It was without money, without a national recognition, and without credit; and, for the purpose of supporting itself, and to carry on the war it had levied against the United States, it resorted to the issue of the notes of its Treasurer, commonly called "Confederate money." To sustain that issue, and to make it the "sinew of war," it called and relied upon its people to support and sustain these notes of its Treasurer, and to give to them currency and circulation as money; by means of which, and, as we think, the only means by which this unlawful and rebellious government could, under the circumstances, have supported

itself and maintained its armies and navies in hostility to the national Government.

This being the authority and purpose for which it was issued, and the use made of it, we are forced, irresistibly, to the conclusion that it was issued without authority of law, and for an unlawful and treasonable purpose, and therefore void.

The act of coining money is the exercise of a sovereign power of a nation; and, under our form of government, the power of coining money is expressly delegated to Congress, and through that department of the Government only can the sovereign right of the people to coin money be exercised. To complete the exercise of this power requires the consent of both houses of Congress and the approval of the President; and by no less a power can bonds or notes of the United States be issued predicated upon the faith and credit of the nation. *Art. 1, sec. 8, Constitution U. S.*

By section 10, article 1, of the Constitution of the United States, it is provided that no State shall enter into any treaty, alliance, or confederation; grant letters of marque and reprisal; coin money; emit bills of credit; make any thing but gold and silver coin a tender in payment of debts, &c.

There can be no doubt, then, that the States are expressly prohibited, by the national Constitution, from coining money, emitting bills of credit, &c. It is certainly true that, if one State can not do one of these acts, no number of them can, by combining and confederating together. It follows, then, that Confederate money, so-called, was not only issued without authority of law, and for an unlawful and treasonable purpose, but it was issued in violation of the plain provisions of the national Constitution.

In the case of *Craig, et al., v. The State of Missouri,* 4 *Peters,* 410, Chief Justice MARSHALL, who delivered the opinion, said: "It has long been settled that a promise made in consideration of an act which is forbidden by law, is void. It will not be questioned that an act forbidden by the Constitution of the United States, which is the supreme law of the land, is

against law. Now, the Constitution forbids a State to 'emit' bills of credit. The loan of these certificates is the very act which is forbidden. * · * * The very act which constitutes the consideration is the act of emitting bills of credit in the mode prescribed by the law of Missouri, which act is pro-hibited by the Constitution of the United States." The court then said, "that the consideration on which the note in this case was given, is against the highest law of the land, and that the note itself is utterly void."

In the case of the *Springfield Bank v. Merrick, et al.*, 14 *Mass.*, 322, a note was made payable in certain bills, the loaning or negotiating of which was prohibited by statute, inflicting a penalty for its violation. The note was held to be void.

In the case of *Hunt v. Knickerbocker*, 5 *Johns. Rep.*, 327, ·it was decided that an agreement for the sale of tickets in a lot-tery, not authorized by the laws of the State, although insti-tuted under the authority of the Government of another State, is contrary to the spirit and policy of the law, and void. The consideration on which the agreement was founded being illegal, the agreement was held void. In *Craig v. The State of: Missouri*, Chief Justice MARSHALL said: "It had been deter-mined, independent of the acts of Congress on the subject, that sailing under the license of an enemy is illegal." And that learned judge, in that case, said that "*Patton v. Nicholson*, 3 *Wheat.*, 204, was a suit brought in one of the courts of this district on a note given to Nicholson by Patton, both citizens of the United States, for a British license. The United States were then at war with Great Britain, but the license was pro-cured without any intercourse with the enemy. The judgment of the circuit court was in favor of the defendant; and the plaintiff sued out a writ of error. The counsel for the defend-ant was stopped, the court declaring that, the use of a license from the enemy being unlawful, one citizen had no right to purchase from or sell to another such a license, to be used on board an American vessel. The consideration for which the

note was given, being unlawful, it follows, of course, that the note was void."

In the light of these and other authorities, on this branch of the subject, we can not conceive of any principle of law upon which the contract in controversy can be sustained.

It is claimed that the Government of the Confederate States maintained itself, and enforced its authority, with such a degree of paramount force as to make valid all contracts between individuals residing within the rebellious States, and subject to the paramount military force of that Government, in all their private transactions, based upon or for the payment of Confederate money.

This proposition we can not affirm. It will be borne in mind that this paramount military force of the Confederate Government was not the military force of a lawful and recognized government, but was the military force of an unlawful and treasonable combination of the citizens of the United States, resident in the rebellious States, conspiring to overturn the Government of the nation within their limits; and that the notes issued by the Treasurer of the Confederate States, called Confederate money, was for the purpose of supporting and maintaining this unlawful and rebellious central government; for the support and maintenance of its rebellious military and naval forces, employed in the prosecution of the war it had levied against the United States. Not incidentally so; but expressly created, put forth and used for the purpose. It was employed for the purchase of the munitions of war and supplies for the rebellious armies and navy of the Confederate States; for the payment of its soldiers and seamen; and, with these notes, those who were engaged in the rebellious armies and navy supplied and supported their families, and others procured substitutes for themselves, to swell the armies of the rebellion.

Could that have been done, had those who resided within the rebellious States refused to receive Confederate money, or give it currency and circulation, upon its first appearance among

them, by using it in their private business transactions? We are of opinion that it could not. Had the people refused to give it currency and circulation, by treating it as money and using it in their ordinary business, we think it would have failed to serve the purpose of its issue. But it is insisted that Confederate money was the only currency or medium of exchange among the people of these States, upon or by means of which the ordinary business of the country could be conducted, and that the necessities of those people, during the rebellion, demand now, upon principles of humanity, that their contracts, based upon or for the payment of Confederate money, should be upheld and enforced by the courts, at least to the extent of the value, that may be established by proof, of such money at the time of making the contract.

It is familiar history that, early in the career of the rebellion, the Confederate Government issued and put in circulation this so-called Confederate money. We think it will not be denied that, at the time this "Confederate money" was issued and put in circulation by the Confederate Government, there was a lawful currency, within the rebellious States, sufficient to carry on the ordinary private business transactions of their people. If this be true, then it follows that the issue by the Confederate authorities of "Confederate money," and the currency and circulation sought to be given it by that Government, was purely and solely for the purpose of aiding and carrying on the rebellion. And the currency, circulation and support given it, by all who used it in their private business transactions, in any manner, directly tended to and was a means whereby the Confederate Government was furnished with the "sinews of war" to enable it to prosecute the rebellion.

Had the people residing within the insurrectionary States refused to accept this "Confederate money," and receive and use it as a circulating medium, in the transaction of their private business, we think it would not be seriously contended that "Confederate money" would have become a circulating

medium at all; certainly not the only one by means of which the private transactions of the people could be conducted.

We are of opinion that, had not these Confederate notes received the support they did, and been upheld as they were, by the people of these States, the rebellion and war, for the support of which they were especially created, would not have continued long enough for the Confederate Government to have obtained, through its military forces, such paramount authority over the lives, property and private business transactions of individuals, within its assumed jurisdiction, as has been claimed for it.

What would have been the result if the people of the rebellious State had not received and used "Confederate money" in their private transactions, and it had failed to become a circulating medium among them?

The answer is obvious, that the Confederate Government must have failed at once; its armies, in open hostility to the national Government, disbanded; its soldiers returned to peaceful pursuits; the lives of hundreds of thousands of the best men of the land, both North and South, would have been saved; the nation would have escaped the expenditure of untold millions of treasure, and the long train of evils, hardships, misery and woe, consequences of the rebellion, would have been avoided.

If this be true, of which we have no doubt, then we think that the use by the people, in their private transactions, of "Confederate money," and the support, currency and circulation given it by such use, so connected all contracts between such individuals, based upon or for the payment of it, with the illegality of its issue, and the purpose for which it was used, as to taint such contracts with the illegality of the original issue of such pretended money, and render them void, as being opposed to the public policy of the nation.

The case of *Toler v. Armstrong,* decided by Justice WASHINGTON, and affirmed by the Supreme Court of the United States, (see 11 *Wheat.,* 258,) is relied on by the courts of our

sister States, that have sustained contracts based upon or for the payment of "Confederate money," as authority.

In that case Toler brought suit against Armstrong, to recover a sum of money paid by him on account of goods, the property of Armstrong and others, consigned to Toler, which had been seized and libeled, in the district court of Maine, in the year 1814, as having been imported into the country contrary to law. The goods were shipped during the late war with Great Britain, at St. Johns, in the Province of New Brunswick, for Armstrong, and other citizens and residents of the United States. The goods were delivered to the agent of the claimants, on stipulation to abide the event of the suit. Toler became liable for the appraised value, and Armstrong's part of the goods was afterwards delivered to him, on his promise to pay Toler his portion of any sum for which Toler might be liable should the goods be condemned. The goods having been condemned, Toler paid their appraised value, and brought suit to recover from Armstrong his proportion of the amount. Armstrong resisted the suit, on the ground that the contract was void, as having been made on an illegal consideration; the plaintiff recovered, and, on error to the Supreme Court of the United States, the judgment was affirmed.

In that case it will be seen that the promise of Armstrong to Toler was wholly disconnected with the illegal importation of the goods. When the promise was made the goods had already been seized by the United States authorities and libeled for condemnation, and it was to procure the possession of them that Armstrong made the promise to Toler, upon which that suit was brought.

That case, and the one under consideration here, are by no means similar. There the promise was made in consideration of obtaining possession of goods having an existence recognized by law, and possessing an intrinsic value; in this case it is a promise to pay in a pretended currency, that never had a legal existence, nor possessed any intrinsic value, but was the

notes of an illegal and treasonable combination, and for an unlawful purpose.

In the case of *Armstrong v. Toler*, Chief Justice MARSHALL said : " In most of the cases, cited by the counsel for the plaintiff in error, the suit has been brought by a party to the original transaction, or contract so connected with it as to be inseparable from it—as, where a vendor of a foreign country packs up goods for the purpose of enabling the vendee to smuggle them ; or where a suit is brought on a policy of insurance on an illegal voyage, or on a contract, which amounts to maintenance, or on one for the sale of lottery tickets, when such is prohibited, or on a bill which *is payable in notes issued contrary to law.*"

"In all these cases," says that learned judge, "the consideration of the very contract on which the suit is brought is vicious, and the plaintiff has contributed to the illegal transaction." The use of Confederate money by the people of the insurrectionary States, in their private business, is not like the use of gold and silver, iron and other products of the earth, nor like goods which have been smuggled into the conntry in violation of the revenue laws, which may be used in aid of rebellion, although the use to which the property was applied in one case, or the introduction into the country without paying the duty in the other, was unlawful ; and, perhaps, in both cases, would render such property liable to seizure and condemnation ; yet, neither case would constitute it an illegal consideration. Such property would constitute a legal and valid consideration for a contract between individuals, provided that the illegal use on the one hand, or the unlawful introduction upon the other, did not enter into the transaction. So long as the purchaser is not deprived of the property by reason thereof, he can not shield himself from the payment of the price, upon the ground that the thing purchased had been used for such unlawful purpose, or had been introduced into the country contrary to the revenue laws. The character of such property would not be changed. But, is that true of " Confederate money ?" As we have seen, it never had a lawful ex-

istence; it possessed no intrinsic value; and having been issued in violation of the plain provisions of the national Constitution, and for an unlawful and treasonable purpose, it never constituted a good or valuable consideration for a contract, or a legal promise. It was neither money or property; it was but the pledge of the faith of the pretended government of the Confederate States to pay a debt incurred by it, in levying war against the Government of the United States, to which all who engaged in the rebellion, or adhered to the Confederacy, owed allegiance.

When "Confederate money" was issued, the States constituting the Confederacy had passed acts or ordinances of secession, so-called; the design of overthrowing the Government of the United States, within those States, had been formed, and the central government of the insurrectionary States, as far as it could be, had been set up. To accomplish this design of overthrowing the national Government, and to execute the attempt of establishing this central government, and to force a recognition of it as an independent nation, by the United States, large armies had been organized and actually engaged in open hostility to the United States. To support and increase these armies, organized and engaged in the work of attempting the overthrow of the national Government, "Confederate money" was devised and brought into existence. It was a part of the great scheme of the rebellion; it was the sinews of war, without which the rebellion must have ceased, and those engaged in it would have returned to their homes, and to their allegiance to the national Government, at a very early period of the insurrection.

We think it will not be denied that, if the parties to a contract for the payment of "Confederate money" knew at the time of making it that such use of such pretended money was aiding the rebellion, directly or indirectly, it would have been illegal, and could not be enforced.

Then, we ask, upon what principle of law can contracts between private individuals, based upon or for the payment of

" Confederate money," be upheld and enforced by the courts, since the rebellion and war levied against the United States, to support and carry on which such pretended money was especially created, has been suppressed, and the Government of the Confederate States, the author of it, has been, by the highest of human agencies, the military power of the nation, defeated, and declared to be but the concentrated power of a treasonable conspiracy against the national Government? We think it must be admitted that all who used "Confederate money" in any manner, in the transactions of their private business affairs, knew that without the success of the rebellious armies, the establisment of the Confederate Government, and a ratification of a treaty of peace between that Government and the Government of the United States, there could be no redemption and payment of such money. Because these Confederate treasury notes bore the evidence of that fact on their face; they were payable, by express stipulation, at a specified time after the ratification of such a treaty.

If this be admitted, and we think it can not be doubted, then the conclusion is irresistible that individuals, in their private transactions, making contracts based upon or for the payment of "Confederate money," did so with the knowledge of illegality of its issue and use, by the pretended central government of the rebellious States, and that, unless that rebellious government succeeded in overthrowing the national Government within these States, and perfected a treaty of peace between that pretended government, and the Government of the United States, there could be no redemption and payment of it. It follows, then, that all persons so using "Confederate money," or taking notes payable in it, to the extent of such contract or notes, became interested in the success of the rebellion. In short, they became stockholders in the rebellious and treasonable conspiracy of the insurgents; and such contracts, we think, were tainted with the illegality of the issue and use of such pretended money, by the rebellious conspirators, and must share the fate of the Confederate Government.

They must be treated as opposed to the public policy of the nation, and void.

If "Confederate money," a mere paper issue of the government of a combination conspiring to overthrow the national Government, and specially created and used for that unlawful and treasonable purpose, possessing no intrinsic value, can be sustained as having been legal for any purpose, we can not conceive of any act of the Confederate Government that could not with equal propriety be held legal and valid. If that pretended government could issue, and make lawful, money to be used in its support, and to swell and maintain its armies in rebellion against the national Government, why could it not seize and confiscate the property of the loyal citizens of the United States for the same purpose? It can not be contended that it would have exercised any higher power in the latter than in the former case; if the notes of the Treasurer of the Confederate States were of any legal validity, for any purpose, the seizure and confiscation of the property of loyal citizens, and titles acquired thereto, under the decrees of the tribunals of the Confederate Government, must be as legal and valid.

If the courts must now hold that "Confederate money" was a legal and valid consideration, or a legal promise, they must also hold that titles, derived under the sequestration laws passed by the Confederate Government, were good and valid. For, it must be borne in mind that the same paramount force of the Confederate Government controlled, in relation to the issue and circulation of "Confederate money," that governed in relation to titles acquired under the sequestration and confiscation laws of the Confederate Government. They were acts of the same power, and for the accomplishment of the same unlawful purpose, and, we think, must stand or fall together.

In the case of *Shortridge v. Mason*, above cited, the court held that compulsory payment, under the sequestration acts of the Confederate Government, to the rebel receiver, of the debt due the plaintiff, a citizen of Pennsylvania, from the defendant, a

citizen of North Carolina, was no discharge; and that, after the suppression of the rebellion and the restoration of the lawful authority of the national Government, the plaintiff is entitled to recover judgment for the principal and interest of his debt, without deduction.

The learned judge, in that case said: "War, therefore, levied against the United States, by citizens of the republic, under the pretended authority of the new State Government of North Carolina, or the new central government which assumed the title of the 'Confederate States,' was treason against the United States." * * * Those who engaged in the rebellion must accept the consequences. If they succeed, rebellion becomes revolution, and the new government will justify its founders. If they fail, all their acts hostile to the rightful government are *violations of law*, and originate no rights which can be recognized by the courts of the nation, whose authority and existence have been alike assailed."

But it is also claimed by some, distinguished by ability and virtue, that the Confederate Government maintained itself for such a great length of time, and the rebellion assumed such vast proportions and magnitude, and became so threatening, that the national Government was compelled to accord to it belligerent rights, and that such concession changed the character of the war from a rebellion to a foreign war; transformed those engaged in it from *traitors* to *alien enemies*, and clothed the pretended central government of the Confederate States with the character of a *government de facto*. This proposition we can not assent to. For, however great may have been the numbers engaged in the rebellion, however vast the proportions it may have assumed, or however long it may have been carried on without recognition as such, can not elevate the rebellious government to the dignity of a government *de facto*, change the insurrection from a rebellion to a national war, relieve those engaged in it of their treason and the responsibilities of their conduct, nor purge the rebellion of its treasonable character.

On this subject we quote the language of Chief Justice CHASE, in the case above cited, who there said: "On what sound principle, then, can we say judicially that the levying of war ceased to be treason when the war becomes formidable? That though war, levied by ten men or ten hundred men, is certainly treason, it is no longer such when levied by ten thousand or ten hundred thousand? That the armed attempts of a few, attended by no serious danger to the Union, and suppressed by slight exertions of the public force, come unquestionably within the constitutional definition; but attempts, by vast combinations, controlling several States, putting great armies in the field, menacing with imminent peril the very life of the republic, and demanding immense efforts and immense expenditure of treasure and blood for their defeat and suppression, swell beyond the boundaries of the definition, and become innocent in the proportion of their enormity?"

In the argument of the learned judge, in response to these propositions, he says: "In modern times it is the usual practice of civilized governments, attacked by organized and formidable rebellion, to exercise and concede belligerent rights. Instead of punishing rebels, when made prisoners in war, as criminals, they agree on cartels for exchange, and make other mutually beneficial arrangements; and, instead of insisting upon offensive terms and designations in intercourse with the civil or military chiefs, treat them, as far as possible, without surrender of essential principles, like foreign foes engaged in regular warfare.

"But these are concessions, made by the legislative and executive departments of government, in the exercise of political discretion, and in the interest of humanity, to mitigate vindictive passions, inflamed by civil conflicts, and prevent the frightful evils of mutual reprisals and retaliations. They establish no rights except during the war."

The learned judge further said, in the same opinion, that, "the national Government has already sought to facilitate restoration, with adequate guarrantees of union, order, and

equal rights; on no occasion, however, and by no act, have the United States ever renounced their constitutional jurisdiction over the whole territory, or over all the citizens of the republic, or conceded to citizens in arms against their country the character of alien enemies or their *pretended government the character of a de facto government.*"

We think that, were we to hold the affirmative of this proposition to be correct, we would assume the jurisdiction and attempt to reverse the decree of the highest tribunal known to nations, *that of arms.*

The people of the rebellious States having appealed to that tribunal, and failed, there is no power now but the political departments of the lawful government that can accord to them rights, or declare legal and valid any of the acts of their central government, that they failed to establish by arms.

It is urged by some that the Government of the Confederate States, until the suppression of the rebellion by the national Government, was supreme; that obedience to it was a necessity of all who resided within its assumed jurisdiction; that, as a consequence of such supremacy, and the obedience rendered to it by the people, the notes of its Treasurer, when used by those people in their ordinary business affairs, acquired a contingent value that should now be recognized and enforced by the courts of the lawful government.

We are aware that the Supreme Court of the United States. have recently affirmed this proposition, and we regret that our convictions of duty impel us to a different conclusion.

We think that it will not be denied that the national Government was forced, by the rebellious conduct of the people of the rebellious States, to call out its military forces to maintain its authority within those States, and to suppress the rebellion; nor do we think it will be denied that the Government prosecuted vigorously the war for the suppression of the rebellion, and to maintain its national unity and authority.

It was the well known policy of the nation, during the insurrection, to destroy all the resources of those States capable

38

of supporting and encouraging the rebellion. No better evidence of this is necessary, we think, than the fact that the ports of the rebellious States were closed to foreign commerce, commercial intercourse between them and the loyal States was forbidden, and the slaves of their people declared emancipated by the Chief Executive, and commander of the armies and navy of the nation.

It is a fact, to which many still living in those States can bear testimony, that it was the policy of the armies of the national Government, employed in the suppression of the rebellion, to capture and destroy all kinds of property within those States that constituted the resources of the rebellion ; the march of those armies was marked by the destruction of the fields and the capture and destruction of all kinds of resources of war.

If this be true, then we ask how can it accord with this war policy of the nation to hold that Confederate treasury notes, issued, as we have seen they were, for an unlawful and treasonable purpose, be held to possess any value, at any time, or for any purpose, contingent or otherwise.

It must be admitted, we think, that the failure of the "Confederate Government" to sustain itself was largely attributable to a want of the confidence of the people of the rebellious States in "Confederate money." Had it been announced by competent national authority, in the year 1863, that contracts made in the rebellious States for the payment of "Confederate money" could be enforced in the courts of the loyal States, we seriously doubt whether the rebellion would have been ended yet ; and, if ended, whether it would not have resulted in the establishment of the independence of the Government of the Confederate States, and consequently the dismemberment of the Federal Union.

We understand it to be a settled doctrine, that it belongs exclusively to the political departments of the lawful government to determine, in cases of civil war, what rights shall be accorded to the belligerents, or what acts of the rebellious gov-

ernment shall be recognized, and to what extent. We think that at no time during the late rebellion, while the war policy of the nation was being as vigorously enforced by its armies and navy as it was, could a court within the loyal States have been found to hold directly against that policy.

If we are correct in our view of the power to determine rights to be accorded to the insurgents, and the acts of the insurrectionary government to be held as legal and valid, we are irresistibly forced to the conclusion that we can not hold contracts based upon or for the payment of " Confederate money " to be legal and valid, however made. For, as we have said, it was issued in violation of law, and for an unlawful and treasonable purpose, and public policy, in our opinion, absolutely demands that such contracts, however made, must be held as being tainted with the illegality of the issue and use of " Confederate money," by the Confederate Government, and void.

The political departments of the national Government have not as yet recognized the Confederate Government to any extent, or any of its acts as legal, except those acts performed by it in the exercise of belligerent rights, such as the exchange of prisoners, making cartels for that purpose, and other kindred acts, accorded to the insurgents, by the national Government, in the interest of humanity, and to relieve those who became prisoners of war from the barbarous cruelties of military prisons, and which concessions " established no rights except during the war," and for no other purpose than those for which they were made.

We know of no act of the national Government that can be tortured into a recognition of " Confederate money " as having any legal validity, at any time, for any purpose. But, on the contrary, it has been the steady policy of the political departments of the Government, during and since the war, to denounce all the acts of the " Confederate Government," for the purpose of rebellion, as unlawful, rebellious and treasonable.

We think that the action of the political departments of the Government, in relation to acts of the insurgents, are binding upon the courts adjudicating such questions. And those departments not having recognized the so-called Confederate Government as having attained supremacy, or the power of exercising the high prerogative of issuing its notes and giving them the character of money, we can not assume so high a power as that of determining a question belonging, as we believe, exclusively to those departments of the Government.

In our form of government, it is only the power and duty of the courts to interpret and declare what the law is, when called upon, and not to make it. That duty devolves upon other departments of the Government.

The judgment of the court is in all things affirmed.

HARRISON, J., dissenting, says:

It is contended that "Confederate notes," having been issued and put in circulation in aid and promotion of the rebellion, all contracts in consideration of or stipulating for the payment of them, were in contravention of law, and void.

From this conclusion, I dissent. I understand the rule in relation to contracts, which grow out of or are the sequences of immoral or illegal transactions, to be, as thus laid down in Story on Contracts: "If the illegality do not form a portion of the contract, but be entirely collateral and capable of complete separation therefrom, it will be binding. But if the illegality be inherent, so that it constitutes a portion of the consideration, the contract will be void." 1 Story on Con., sec. 621.

Justice WASHINGTON, in Toler v. Armstrong, 4 Wash. C. C. R., 297, gives a very clear application of the rule. He says: "The principle of the rule is, that no one ought to be heard in a court of justice, who seeks to enforce a contract founded in, or arising out of, moral or political turpitude. The rule itself has sometimes been carried to inconvenient lengths, the diffi-

culty being, not in any unsoundness in the rule itself, but in its fitness to the particular cases to which it has been applied. Does the taint in the original transaction infect and vitiate every contract growing out of it, however remotely connected with it? This would be to extend the rule beyond the policy which produced it, and would lead to the most inconvenient consequences. Carried out to such an extent, it would deserve to be entitled 'a rule to encourage and protect fraud.' So far as the rule operates to discourage the perpetration of an immoral or illegal act, it is founded in the strongest reason; but it can not safely be pushed further. If, for example, the man who imports goods for another, by means of a violation of the laws of his country, is disqualified from founding any action upon such illegal transaction for the value or freight of the goods, or for other advances made on them, he is justly punished for the immorality of the act, and a powerful discouragement from the perpetration of it is provided by the rule.

"But, after the act is accomplished, no new contract ought to be affected by it. It ought not to vitiate the contract of the retail merchant, who buys these goods from the importer; that of the tailor, who purchases from the merchant, or of the customers of the former, amongst whom the goods are distributed in clothing, although the illegality of the original act was known to each of these persons at the time he contracted.

"I understand the rule, as now *clearly* settled, to be that, where the contract grows *immediately* out of and is connected with an illegal or an immoral act, a court of justice will not lend its aid to enforce it; and, if the contract be in part only connected with the illegal transaction, and growing immediately out of it, though it be in fact a new contract, it is equally tainted by it. The case before supposed, of any action for the value of goods illegally imported for another, or for freight and expense attending it, founded upon a promise, express or implied, exemplifies a part of the above rule. The latter part of it may be explained by the following case: as, if

the importation was the result of a scheme to consign the goods to the friend of the owner, with the privity of the former, that he might protect and defend them for the owner, in case they should be brought into jeopardy, in consequence of some intended violation of law, I should consider a bond or promise, afterwards given by the owner to his friend, to indemnify him for his advances, on account of any proceedings against the property, or otherwise, as constituting a part of the *res gesta*, or of the original transaction, though it purports to be a new contract.

"For, it would clearly be a promise growing immediately out of and connected with the illegal act. It would be, in fact, all one transaction, and the party to whom the promise was made would, by such a contrivance, contribute, in effect, to the success of the illegal measure. But if the promise be unconnected with the illegal act, and is founded on a new consideration, it is not tainted by the act, although it was known to the party to whom the promise was made, and although he was the contriver and conductor of the illegal act."

This very clear exposition of the law was, in the same case, upon error, in the Supreme Court of the United States, approved by Chief Justice MARSHALL, in his opinion affirming the judgment of the circuit court. *Armstrong v. Toler*, 11 *Wheat.*, 25. From it it is seen that the validity of a contract is not affected by the mere fact that it emanates from or is the sequence of an illegal or immoral transaction; but, to be infected by its turpitude, it must be so immediately connected with the transaction as to be in aid and furtherance of it; or, in other words, the illegality must be inherent and constitute a part of it.

Many cases might be cited, in illustration of the above mentioned rule, but I will only refer to a few. In *Tenant v. Elliott*, 1 *Bos. and Pull.*, 3, the defendant, a broker, effected, in violation of the navigation laws, an insurance for the plaintiff, a British subject, on goods from Ostend to the East Indies, on board an imperial ship. The ship being lost, the underwriters

paid the amount of the insurance to the defendant, who refused to pay it over to the plaintiff. It was held that the illegality of the original transaction did not affect the implied promise of the defendant, arising out of the receipt of the money for the plaintiff, and that the plaintiff was entitled to recover. In *Farmer v. Russell, et al., ib.*, 296, the defendants, common carriers, conveyed for the plaintiff, to a person at Portsmouth, a quantity of counterfeit half pence, to be distributed among the sailors, and received from him, on account of the same, a sum of money for the plaintiff, a part of which they refused to account for, and to recover which was the object of the suit. The plaintiff recovered, upon the ground that the cause of action was not founded on the illegal transaction, but on another totally distinct promise.

In *Faikney v. Reymous, et al.*, 4 *Burr*, 2069, the plaintiff was allowed to recover on a bond, given by the defendants, to secure the payment of one half of a loss sustained in certain illegal transactions, in which the plaintiff and one Richardson were jointly concerned, the whole of which he had paid.

In *Petrie, et al., v. Hannay*, 3 *T. R.*, 418, the plaintiffs' testator and the defendant, having been engaged together in illegal stock speculations, and having incurred losses, they came to a settlement with their broker, one Portis, who had paid their losses for them. Plaintiffs' testator paid the whole amount advanced, except £811, part of the defendant's share, and for that drew a bill in favor of Portis, on the defendant, which he accepted. The bill, not being paid when it became due, Portis, after the testator's death, brought an action on it against the plaintiffs, and recovered the amount, the illegality of the transaction not being pleaded.

The plaintiffs, to be reimbursed the amount recovered of them on the bill, brought an action against the defendant for money paid for him. The court held that they were entitled to recover. *McBlair v. Gibbs, et al.*, 17 *How.*, 232, if possible, is still more directly in point in this case.

The administrator of Lyde Goodwin filed a bill against

the executors of Robert Oliver, to recover the proceeds of a share in an association called the Baltimore Mexican Company, which had a claim against the Mexican Government, founded on a contract with General Mina, in 1816, for advances and supplies in fitting out a military expedition against the dominions of the King of Spain, that was allowed under the Convention of 1839, for the adjustment of claims of citizens of the United States against the Republic of Mexico. The proceeds of the share had been paid over to the defendants, and they set up a right to retain the same under an assignment of the share, by Goodwin himself, to Oliver, in 1839, for the relinquishment of a debt he owed Oliver.

It was urged against the claim of Oliver's executors that the contract with General Mina, being in violation of the neutrality act of 1794, the sale and assignment of it from Goodwin to Oliver, before its recognition and fulfillment by the Mexican Government, was also illegal, and consequently no interest therein passed to the executors. The court, however, say: " But this position is not maintainable. The transaction, out of which the assignment to Oliver arose, was uninfected with any illegality. * * * The assignment was subsequent, collateral to, and wholly independent of the illegal transactions upon which the principal contract was founded. Oliver was not a party to these transactions, nor in any way connected with them. It may be admitted that even a subsequent collateral contract, if made in aid and in furtherance of the execution of one infected with illegality, partakes of its nature, and is equally in violation of law ; but that is not this case. Oliver, by the assignment, became simply owner in the place of Goodwin; and as to any public policy, or concern, supposed to be involved in the making or in the fulfillment of such contracts, it was a matter of entire indifference to which it belonged. The assignee took it liable to any defénse, legal or equitable, to which it was subject in the hands of Goodwin. In consequence of the illegality, the contract was invalid, and incapable of being enforced in a court of justice. The fulfill-

ment depended altogether upon the voluntary act of Mina, or of those representing him."   ·

The cases referred to in the opinion of the court, as sustaining the objection raised to the validity of such contracts, have no application to the point in controversy.

In each of the cases, so referred to, the illegal act was a part of the contract. Thus, in the case, in Massachusetts, of *The Springfield Bank v. Merrick, et al.*, the note sued on was payable in notes of banks of another State which, by a statute, it was made unlawful for any bank in the State of Massachusetts to receive or in any manner deal in.

In *Hunt v. Knickerbocker*, the plaintiff sought to recover for lottery tickets, which he had furnished the defendant to sell; the sale of which was prohibited by law.

*Patton v. Nicholson* was a suit for the price of a license or pass from the public enemy, during the late war with Great Britain, to be used on board an American vessel; and *Craig, et al., v. The State of Missouri* was an action on a note, the consideration of which was loan office certificates, or bills of credit, issued by the State of Missouri to the defendants, in violation of the Constitution of the United States.

But it is insisted that as it was the intention and purpose, when the Confederate notes were issued and put in circulation, that they should circulate as currency—as a means of maintaining the rebellion; negotiations and dealings in them were in the fulfillment and execution of such purpose, and consequently in aid of the rebellion, and were therefore against public policy.

When it is recollected that for several years these notes constituted the only circulating medium in the State, and passed from hand to hand as money, in the business transactions of the people, and that necessity compelled such use, the objection that such dealings and use were against public policy, must obviously appear to be without foundation. That it was not against the policy of the State at that time, which was in the military occupation of the Confederate States, and the laws

and authority of the United States within it wholly excluded or suspended, admits of no question. Castine, in Maine, during the war with Great Britain, was for several months occupied by the British forces. Judge STORY, in the case of the *United States v. Hayward*, 2 *Gall.*, 485, which grew out of such occupation, said : " By the conquest and occupation of Castine, that territory passed under the allegiance and sovereignty of the enemy. The sovereignty of the United States over the territory was, of course, suspended, and the laws of the United States could no longer be rightfully enforced, or be obligatory upon the inhabitants who remained and submitted to the conquerors. Castine, therefore, could not, strictly speaking, be deemed a part of the United States, for its sovereignty no longer extended over the place."

The same principle was held to apply to the occupation of Tampico, and the State of Tamaulipas, by the troops of the United States, in the war with Mexico. *Fleming v. Page*, 9 *How.*, 603.

Halleck says : "Wars of insurrection, of rebellion, and of revolution, come under the general head of *civil wars, and are governed by the same rules, so far as regards international law and the laws of war.*" *Elements of International Law and the Laws of War*, 153. Speaking of the declaration of war and its effects, the same author says : "Its effects upon the relations of the citizens of a belligerent State, with their own government, belong to constitutional or municipal law rather than to general public law ; nevertheless, as there are certain general principles which govern these relations, in all countries and under all governments, it may be proper to allude to them. For example, any place, port, town, fortress, or section of country, occupied by the enemy, is, for most purposes, regarded in law as *hostile territory*, so long as such occupation is continued. If the place so occupied was previously neutral, or a part of our own territory, it is no longer regarded as such, for it would be absurd to suppose that persons who are hostile themselves, or who are under a hostile authority, are to exercise the same

civil rights as neutrals or citizens in time of peace. The relations of the government to a place or territory, so occupied or situated, are of a military character, and consequently are not regulated by the civil laws, which are made for the conditions of peace." *P.* 166.

In the case of *Thorington v. Smith*, decided by the Supreme. Court of the United States at the present term, Chief Justice CHASE says: " The whole territory controlled by it (the Government of the Confederate States) was thereafter held to be enemies' territory, and the inhabitants of that territory were held, in most respects, for enemies. To the extent, then, of actual supremacy, however unlawfully gained, in all matters of government, within its military lines, the power of the insurgent government can not be questioned. That supremacy would not justify acts of hostility to the United States. How far it should excuse them must be left to the lawful government upon the reëstablishment of its authority. But it made civil obedience to its authority not only a necessity, but a duty. Without such obedience civil order was impossible." *See Am. Law Review, January,* 1870; *Mrs. Alexander's cotton,* 2 *Wallace,* 404.

The question presented, in the case before the court, the validity of contracts for the payment of Confederate notes, made during the war, within the lines of the Confederate forces, is directly decided in the case of *Thorington v. Smith,* Speaking of such contracts, the Chief Justice says: " It seems to follow, as a necessary consequence, from the actual supremacy of the insurgent government, as a belligerent, within the territory where it circulated, and the necessity of civil obedience on the part of all who remained in it, that this currency must be regarded, in courts of law, in the same light as if it had been issued by a foreign government, temporarily occupying a part of the territory of the United States.

Contracts stipulating for payments in that currency can not be regarded as made in aid of the foreign invasion in the one case, or of the domestic insurrection in another. They have no

necessary relation to the hostile government, whether invading or insurgent; they are transactions in the ordinary course of civil society, and, although they may indirectly and remotely promote the ends of the unlawful government, are without blame, except when proved to have been entered into with actual intent to further the invasion or insurrection." *Martin v. Hortin*, 1 *Bush.*, 629 ; *Green v. Sizer*, 40 *Miss.*, 530.

I think the authorities I have presented are conclusive.