# D. H. CULLINS, *et al.* v. J. B. OVERTON, *Sheriff, et al.*

(Filed July 30, 1898.)

1. GREER COUNTY—*De Facto Tribunals—Valid Judgments.* The authorities of the state of Texas, by legislative enactment, organized the disputed territory known as "Greer county" into a county government, and the inhabitants of such territory exercised all the governmental functions, legislative, executive, and judicial, for a number of years, and until March 16, 1896; the United States acquiesced in such acts until it was decided by the supreme court of the United States that such territory belonged to the United States, and was not within the boundaries of the state of Texas. *Held,* that such county government was a *de facto* government, and the courts held therein under and by virtue of the laws of Texas were *de facto* courts, and a judgment duly rendered in the county court of Greer county during such period is a valid and binding judgment.

2. COURTS—*Greer County—Transfer of Causes.* The act of congress of May 4, 1896 (29 Stat. 113), which contains the provision that "where an appeal or writ of error has been taken from a judgment in any civil or criminal case rendered by any of said courts of Greer county, Texas, to any other court of Texas, the judgment of such appellate court shall be binding upon all parties to such case, and upon the filing of a certified copy thereof in the court of Oklahoma, having jurisdiction of like cases, it shall be the duty of such court to enter the same on its minutes and proceed in said action in all respects as though it had rendered the original judgment therein," authorizes the appellate court to determine a case pending therein on appeal from the county court of Greer county, taken prior to March 16, 1896, but not decided until after that date, and is clearly within the legislative power of congress relating to courts for the territories.

3. APPEAL—*Mandate—Notice.* Where a cause is appealed from an inferior to an appellate court, and cause decided by appellate court, and remanded, with directions to lower court how to proceed, on the filing of the mandate in the lower court it may legally proceed to carry out the directions of the court of appeals without further notice to the parties to said cause.

4. JUDGES—*Disqualified, May Act When.* The judge of a court who is disqualified in a cause by reason of interest may properly enter a formal judgment directed by the appellate court, as in such case he is not required to exercise any judgment or discretion.

5. PROBATE COURT—*Greer County—Jurisdiction.* The probate court of Greer county, Oklahoma, has, with few exceptions, jurisdiction of the causes tried or pending in the county court of Greer county, Texas.

(Syllabus by the Court.)

*Error from the District Court of Greer County; before J. R. Keaton, District Judge.*

*A. R. Garrett* and *R. E. Green,* for plaintiffs in error.

*J. G. Bogard* and *T. P. Clay,* for defendants in error.

Action by D. H. Cullins and others against J. B. Overton, sheriff, and others, to obtain equitable relief against a judgment. From a judgment for defendants, plaintiffs appeal. Affirmed.

Opinion of the court by

BURFORD, C. J.:  On the 9th day of August, 1893, one C. H. Bast brought a suit in the county court of what was then denominated "Greer county, Texas," against D. H. Cullins, S. C. Van Leer, and J. H. Simpson, for an alleged unlawful conversion of certain personal property, and also against J. W. Rose, H. C. Sweet, and J. R. Crouch, as sureties on the official bond of the defendant Cullins, who was a constable in said  Greer county. Issues were formed, and on the 13th day of July, 1895, a judgment was rendered in said cause by said county court in favor  of the plaintiff, Bast, and against defendants D. H. Cullins, S. C. Van Leer, H. C. Sweet, J. W. Rose, and J. R. Crouch for the sum of $167.50, actual damages, with interest thereon from the 18th day of July, 1895, at the rate of 6 per cent., and the further sum of $55, exemplary damages, against Cullins and Van Leer, and for costs against all the defendants.

From this judgment the defendants appealed to the

court of civil appeal of Texas, Second supreme judicial district, sitting at Ft. Worth, Tex., and filed an appeal bond as required by the laws of Texas, with I. Q. Sewell and S. H. Tittle as sureties thereon. On the 18th day of September, 1896, the court of civil appeals of Texas proceeded to hear and determine said cause, and ordered that the judgment in the county court be reformed so as to decree a recovery against J. W. Rose, H. C. Sweet, and J. R. Crouch as sureties, only, on the official bond of D. H. Cullins, and when so reformed that said judgment be in all other respects affirmed, and at the same time entered a judgment in favor of Bast and against D. H. Cullins and S. C. Van Leer as principals, J. W. Rose, H. C. Sweet, and J. R. Crouch as sureties on the official bond of D. H. Cullins, and I. Q. Sewell and S. H. Tittle as sureties on the appeal bond, for the amount adjudged in the county court, and against all the defendants and sureties for costs in said appellate court. At the March term, 1897, of the probate court of Greer county, Oklahoma Territory, C. H. Bast appeared, and moved said court to modify and reform the judgment theretofore entered in said cause by the county court of Greer county, Tex., so as to conform to the mandate and judgment of the court of civil appeals of Texas, as directed by that court on the 18th day of September, 1896; and said motion was allowed, and the judgment aforesaid was reformed as directed by the appellate court, and judgment entered against D. H. Cullins and S. C. Van Leer as principals, and H. C. Sweet, J. W. Rose, and J. R. Crouch as sureties. On March 17, 1897, the probate judge of Greer county, Oklahoma, issued an execution on said judgment against all of said defendants,

and also against Sewell and Tittle, sureties on the appeal bond, and delivered same to J. B. Overton, sheriff of Greer county.   On April 17, 1897, D. H. Cullins, S. C. Van Leer, J. W. Rose, H. C. Sweet, S. H. Tittle, J R. Crouch, and I. Q. Sewell, as plaintiffs, filed their petition in the district court of Greer county against C. H. Bast, J. B. Overton, sheriff, and T. P. Clay, probate judge, defendants, in which they set up all the facts as hereinbefore recited, and alleged further that the action of the court of civil appeals of Texas was without jurisdiction, and their judgment void, and that no notice was had or waived, or appearance made, by any of the defendants, of the proceedings had before the probate court of Greer county, Oklahoma, and that the probate judge, T. P. Clay, was, at the time he rendered and reformed said judgment, in 1897, the attorney for C. H. Bast in said cause, and was a part owner in said judgment; and asked for a temporary restraining order enjoining the enforcement of said execution, and on final hearing a permanent injunction against further attempting to enforce said judgment, and for such equitable relief as the court might find them entitled to.   The judge of the district court, in chambers, granted the temporary order asked for, and at the May term, 1897, a demurrer was filed to the petition, which was sustained, and the cause dismissed, at costs of plaintiffs.   From this judgment, sustaining defendants' demurrer, and dismissing their petition, the plaintiffs prosecute this appeal.

In order to a proper understanding of the questions involved, it is necessary to look to the historical facts, congressional enactments, and judicial determinations relating to the past and present political status of Greer

county. Greer county comprises all the territory east of the 100th meridian, and lying between the North and South Forks of the Red river, and was disputed territory between the United States and state of Texas since the treaty with Spain, entered into in 1819. Texas claimed that the North Fork was the true or main channel of the Red river, and constituted her northern boundary line from the confluence of the North and South Forks westward to the 100th meridian; while the United States contended that the South Fork was the true or main channel of the Red river, and from the junction of the two forks to the 100th meridian west constituted the boundary line of the state of Texas. Recognizing this unsettled question, congress, by act of May 2, 1890, (chapter 182,) establishing a temporary government for the Territory of Oklahoma, and defining its boundaries, included the disputed territory within the boundaries of Oklahoma, but declared that that act should not apply to Greer county until the title to the same had been adjudicated and determined to be in the United States. And, that there might be a speedy judicial determination of that question, the attorney general of the United States was directed to institute in the supreme court of the United States a suit in equity against the state of Texas, setting forth the title and claim of the United States "to the tract of land lying between the North and South Forks of the Red river, where the Indian Territory and the state of Texas adjoin, east of the 100th degree of longitude, and claimed by the state of Texas as within its boundary, and part of its land, designated on its map as Greer county." Pursuant to this act, a suit was brought by the United States against the state of Texas.

and was finally determined on the 16th day of March, 1896, and the court held that: "The territory east of the 100th meridian of longitude, west and south of the rver now known as the 'North Fork of Red River,' and north of a line following westward, as prescribed by the treaty of 1819 between the United States and Spain, the course, and along the south bank both of Red river and the river now known as the 'Prairie Dog Town Fork,' or 'South Fork of Red River,' until such line meets the 100th meridian of longitude, (which territory is sometimes called 'Greer county,') constitutes no part of the territory properly included within or rightfully belonging to Texas at the time of the admission of that state into the Union, and is not within the limits, nor under the jurisdiction, of that state, but is subject to the exclusive jurisdiction of the United States of America." (*U. S. v. Texas*, 162 U. S. 1, 16 Sup. Ct. 725.)

Immediately upon the promulgation of this decision the territory known as "Greer county, Texas," became subject to the government of the Territory of Oklahoma, and all the laws of Oklahoma became operative in said disputed territory, and the governmental powers of Oklahoma, executive, legislative, and judicial, became applicable thereto. From the admission of Texas into the Union as a state until March 16, 1896, that state had exercised all the functions of a state government in and over said disputed territory and its inhabitants and their property; and, while this action upon the part of its executive, legislative, and judicial officers was acquiesced in by the United States government, its right to exercise the same was never admitted by the United States, but was at all times denied. As early as 1860 the state of

Texas, by legislative enactment, created the county of Greer, with boundaries embracing all the disputed territory, and established courts in said county, provided for a full complement of officers for all purposes, established a common-school system therein, and the people of said county recognized said government and authority, and exercised all the rights and privileges of citizens of the state of Texas continuously up to and until the supreme court of the United States decided that the disputed territory belonged exclusively to the United States. A regularly organized government was carried on under the laws of Texas. Courts were held, and their powers and authority recognized and enforced in matters both civil and criminal, and no other jurisdiction or government made any attempt to enact or enforce local laws, or carry on the functions of political government, in said territory, except in so far as the United States exercised the authority of the federal government and enforced the federal laws in said territory. Recognizing the fact that the transfer of Greer county from the jurisdiction of the state of Texas to that of Oklahoma Territory would result in making questionable, at least, if not void, many of the acts of officials and courts performed and done under the laws of Texas, congress, by an act approved May 4, 1896, attempted to legalize and cure all defects in the acts of these officers and courts which were within the legislative power to legalize. That act reads as follows (29 Stat. 113):

"Be it enacted by the senate and house of representatives of the United States of America in congress assembled, that the portion of the Territory of Oklahoma bounded by the North Fork of the Red river and the state of Texas, heretofore known as Greer county, Texas,

be, and the same is hereby established as Greer county, of Oklahoma, with Mangum as the county seat. The present county officers of said county shall be continued in office until the first Tuesday of November, eighteen hundred and ninety-six, or until their successors are elected and qualified, at an election to be held on the said first Tuesday of November, eighteen hundred and ninety-six, as provided by the laws of the Territory of Oklahoma. All provisions of law applicable to the organization and government of counties in Oklahoma shall forthwith be applied by the proper officers thereof to said Greer county, the intention being to provide without delay, the same organized government for said Greer as for other counties of Oklahoma. All public buildings and property of every description heretofore belonging to Greer county, Texas, or used in the administration of the public business thereof is hereby declared to be the property of said Greer county, Oklahoma, and the officers thereof shall, as soon as appointed, take immediate charge and custody thereof; and all school property in said county shall become the property of the respective school districts in which the same are situated.

"Sec. 2. That all proceedings and actions of every kind in or before the several courts and officers of Greer county, Texas, shall have the same force and effect as if said courts and officers of Greer county, Texas, had been legally authorized courts and officers of the United States or of the Territory of Oklahoma, and the courts of said Territory having jurisdiction of similar matters shall make and issue all orders and writs necessary to enforce the orders, decrees, and final judgments of said courts and officers of Texas.

"Sec. 3. That all suits which were pending in the several courts of said Greer county, Texas, on March sixteenth, eighteen hundred and ninety-six, as shown by the dockets thereof, shall be entered upon the dockets of the courts of Oklahoma having jurisdiction of like cases, and the same shall proceed as if they had been

brought in said courts of Oklahoma. Where an appeal or writ of error has been taken from a judgment in any civil or criminal case rendered by any of said courts of Greer county, Texas, to any other court of Texas, the judgment of such appellate court shall be binding upon all parties to such case, and upon the filing of a certified copy thereof, in the court of Oklahoma having jurisdiction of like cases, it shall be the duty of such court to enter the same upon its minutes and proceed in said action in all respects as though it had rendered the original judgment therein. All rights in the cases mentioned in this section shall be determined by the law of Texas applicable to the act or transaction involved, and the courts shall take judicial notice of such law for that purpose. When any judgment affirmed by any such appellate court provides for imprisonment, such imprisonment shall be in such place as the proper court of Oklahoma shall designate.

"Sec. 4. That all records, minutes, and files of any of the courts and officers mentioned in section 2 of this act shall be preserved and kept by the proper courts and officers of Oklahoma, and they, or certified copies thereof, shall be competent evidence. All written contracts, conveyances, mortgages, liens, or other instruments which have been heretofore filed or recorded in said Greer county in conformity with the laws of Texas, shall be held and considered to have been legally filed or recorded, and it shall not be necessary again to file or record them. And all interest, right, titles, and estates, conveyed, limited, encumbered, or in any wise affected by any contract, lien, conveyance, mortgage, or other instrument, or by any judgment or decree of any court of Texas of competent jurisdiction, and all judgments of said courts, civil and criminal, prior in date to March sixteenth, eighteen hundred and ninety-six, shall have the same force and effect, in all respects, as if said Greer county had legally formed a part of the territory of the state of Texas up to March sixteenth, eighteen hundred and ninety-six, and

had upon that date been lawfully ceded by Texas to the United States with a reservation and ratification of all existing rights and liabilities according to the laws of Texas.

"Approved May 4, 1896."

It will be observed that this act transfers the entire government of Greer county, executive, legislative, and judicial, from the state of Texas to the Territory of Oklahoma, and is supplemental to the Organic Act of Oklahoma Territory. It declares valid all judgments rendered by the courts of Greer county acting under Texas laws, and provides that all causes pending on appeal in any of the appellate courts of Texas may be disposed of in such courts, and the judgment of such appellate court shall be binding upon all parties to such case. That all causes pending shall be docketed and proceeded with in and by the courts of Oklahoma.

With these historial facts, anomalous conditions, and legislative provisions in view, we must determine whether the district court of Greer county erred in sustaining a demurrer to the petition of plaintiffs in error. It is contended by counsel for plaintiffs in error: First, that all judgments rendered by the courts of Greer county, Texas, were without authority or jurisdiction, and absolutely void; second, that the legislative branch of the government has no power to legalize judgments void for want of jurisdiction; third, that the Greer county courts were not even *de facto* courts, and hence there was no power to legalize their proceedings; fourth, that the action of the court of civil appeals in retaining jurisdiction of the case of Bast against Cullins, *et al.*, after Greer county became a part of Oklahoma, was without authority, and its proceedings void; fifth, that the judg-

ment entered in the probate court of Greer county, Oklahoma, was void for the reason that the defendants had no notice of the proceedings, and for the further reason that the probate judge was not qualified, by reason of interest, to act in the cause.

The question of the status to be given the judgments and proceedings of the courts of Greer county, Texas, during the period Greer county was under Texas rule presents a problem both novel and difficult. Counsel have referred us to no authorities, and, after a careful and extensive research, we have been able to find but few adjudicated cases involving similar questions. During the war of the rebellion, a number of the southern states passed ordinances of secession and set up independent state governments hostile and in opposition to the authority of the United States government. During the period of belligerency these insurgent state governments maintained executive, legislative, and judicial departments, and carried on all the governmental functions. Numerous questions as to the validity of these state governments arose, both during and after the war, and found their way into the supreme court of the United States for settlement.

In one of this class of cases, viz. *Texas v. White,* 7 Wall. 700, Mr. Chief Justice Chase said: "It is an historical fact that the government of Texas, then in full control of the state, was its only actual government; and certainly, if Texas had been a separate state, and not one of the United States, the new government having displaced the regular authority, and having established itself in the customary seats of power, and in the exercise of the ordinary functions of administration, would have constitut-

ed, in the strictest sense of the words, a *de facto* government, and its acts, during the period of its existence as such, would be effectual, and in almost all respects valid. And to the same extent this is true of the state of Texas, though unlawful and revolutionary as to the United States. It is not necessary to attempt any exact definitions within which the acts of such a state government must be treated as valid or invalid. It may be said, perhaps with sufficient accuracy, that acts necessary to peace and good order among citizens—such, for example, as acts sanctioning and protecting marriage, and the domestic relations, governing the course of descents, regulating the conveyance and transfer of property, real and personal, and providing remedies for injuries to person and estate, and other similar acts, which would be valid if emanating from a lawful government—must be regarded in general as valid when proceeding from an actual, though unlawful, government; and that acts in furtherance or support of rebellion against the United States, or intended to defeat the just rights of citizens, and other acts of like nature, must, in general, be regarded as invalid and void."

In *Horn v Lockhart*, 17 Wall. 570, Mr. Justice Field said: "We admit that the acts of the several states in their different departments of government, executive, judicial, and legislative, during the war, so far as they did not impair or tend to impair the supremacy of the national authority, or the just rights of citizens under the constitution, are, in general to be treated as valid and binding."

Supporting the principle that the acts of *de facto* governments are legal and binding, are the following addi-

tional authorities: *Thorington v Smith*, 8 Wall 1: *U. S. v Rice*, 4 Wheat. 253; *Fleming v. Page*, 9How. 614; *Sprott v. U. S.* 20 Wall. 459; *U. S. v. Insurance Co.*, 22 Wall. 99; *Texas v. White*, 7 Wall. 700.

It cannot be questioned that the state of Texas, with a *de jure* government, maintained a *de facto* government in Greer county. Its courts were constituted in the manner provided by the laws of Texas, and authorized by legislative enactments. Its officers held by commissions and certificates of election authorized and issued by Texas authorities. The control of Texas in local and domestic affairs was supreme and undisturbed. It had every attribute, and performed every function, of a *de jure* government, except the right to exist. It has always been the policy of our government to recognize as valid the acts and laws of *de facto* governments.

In *Hildreth's Heirs v. McIntire's Devisee*, 1 J. J. Marsh. 206, the court said: "Where government is entirely revolutionized, and all its departments usurped by force, or by the voice of majority, then prudence recommends, and necessity enforces, obedience to the authority of those who may act as public functionaries; and in such a case the acts of a *de facto* executive, a *de facto* judiciary, and a *de facto* legislature must be recognized as valid."

For a long time there was a dispute between the states of Ohio and Michigan as to the location of the boundary line between those two states. There was much controversy and legislation respetcing the question, but Michigan exercised jurisdiction over the disputed territory, and denied the Ohio authorities the right to interfere. In 1835 the legislature of Ohio was convened in special session, and proceeded to organize Lucas county, made up

largely of the disputed territory, and the courts of that county attempted to exercise jurisdiction in the disputed territory.    Michigan resisted this attempt, and continued to exercise dominion over the country in dispute.    During this period a bill in chancery was filed in the common pleas court of Lucas county, Ohio, to compel specific performance of a contract for conveyance of a tract of land in the disputed territory.    The court decreed the conveyance.    Afterwards it was determined that this territory was a part of and belonged to the state of Ohio. The validity of the decree entered by the common pleas court was subsequently called in question, and the supreme court of Ohio held it void, for the reason that Michigan was exercising her sovereignty over the disputed territory at the time the decree was rendered.    In the opinion in this case (*Daniels v. Stephens, Lessee*, 19 Ohio, 222) Mr. Chief Justice Hitchcock said:  "Now, it seems to the court that under the circumstances of the case we are not called upon to decide which of the parties to this controversy had the legal right to this territory.    It is sufficient for us to ascertain which of them exercised jurisdiction over it.    We concur with plaintiff's counsel that it is the government *de facto* of a country whose laws and proceedings are to be recognized, whether it be a government *de jure* or not.    With us the question is, which of the two governments, Ohio or Michigan, exercised jurisdiction over this disputed territory?    And this question is answered by the agreed case.    From this it is apparent that Michigan exercised jurisdiction to the Fulton line, and further there is nothing in the case to show that people of the territory objected to this jurisdiction." And the court held the decree void for want of jurisdiction.

Upon the principles enunciated in the foregoing authorities, we have no hesitancy in holding that from the time Greer county was organized as a county by the state of Texas up to the 16th day of March, 1896, there was a *de facto* government in Greer county, and that the county court of Greer county was a *de facto* court, and that all its judgments and proceedings which were had and done according to the laws of the State of Texas, are valid and binding, and should be recognized, and given full faith and credit. During that period the state of Texas, a *de jure* government, exercised undisturbed sovereignty and jurisdiction over said territory, and it is not shown or claimed that the inhabitants made any objection thereto. And while this power was exercised without right, it constituted a *de facto* government, executive, legislative, and judicial, and all the acts of its officers and courts, not in contravention of any rights under the laws and constitution of the United States, are valid and binding.

Counsel for plaintiffs in error contend that the legislative branch of the government has no power to legalize a judgment void for want of jurisdiction in the court which rendered it. We concede this is a correct statement of the law, but, inasmuch as the judgment rendered by the *de facto* court of Greer county was valid, and not void, the act of congress referred to was not necessary to its validity, and added nothing to its force. Hence the principle contended for has no application to the question under consideration.

The next contention is that the court of civil appeals of Texas had no power or jurisdiction to pass upon the appeal after the 16th of March, 1896. This would evi-

dently be correct, were it not for the authority conferred by the act of congress, hereinbefore referred to. After March 16, 1896, the territory embraced in Greer county became for all purposes a part of the Territory of Oklahoma, and congress had full power to legislate in reference to its affairs. The disposition and distribution of the judicial powers for the Territory is vested solely in congress, in virtue of that clause of the constitution which authorizes congress to make all needful rules and regulations respecting the territories belonging to the United States. (*Clinton v. Englebrecht*, 13 Wall. 434.)

In the exercise of this power, there are no limitations which prevent congress from conferring the power to hear appeals or review judgments upon any state court which would accept and perform such duties. The cause in question was pending in the civil court of appeals in the state of Texas at the time the act of congress was approved, and by the authority conferred in that act said court had jurisdiction to determine the case, and remand its judgment to the probate court of Greer county, Oklahoma. This it did, and directed the probate court to reform the judgment by making it to operate against a portion of the defendants as principals and the others as sureties.

The plaintiffs in error further allege that the probate court of Greer county proceeded to enter judgment as directed by the appellate court of Texas, without notice to them. We know of no rule of law or practice which entitled them to any further notice than that which the record and proceedings furnished. They had, by their own act and choice, appealed the case to the appellate court. They were bound to take notice of its judgment,

and of the proceedings in the probate court had pursuant to the order of the appellate court.

The last allegation in the petition for injunction is that the probate judge who entered the judgment upon which the execution issued was at the time he entered same disqualified to act as judge in said cause by reason of interest. This objection would be well taken if the probate judge had been required to exercise any judgment or act judicially in the matter complained of. But it appears that the judgment was rendered by the county court of Greer county, Texas, before he became judge of the probate court; that the appellate court directed the form of judgment which the probate court should enter; and in entering said judgment upon the record of said court he was simply obeying the mandate of the appellate court, and was required to exercise no judgment in the premises.

We have now disposed of all the questions presented by the petition and demurrer, and, in our judgment, the district court committed no error in sustaining the demurrer and dismissing the petition. There is no equity in the case. If the judgment was erroneous, the remedy of plaintiffs was by appeal, or to proceed under the provisions of sections 4464--4476, Oklahoma Statutes 1893. The judgment of the district court is affirmed, at costs of plaintiffs in error.

All of the Justices concurring.